551 So.2d 861 (1989)
In the Matter of the EXTENSION OF the BOUNDARIES OF the CITY OF JACKSON, Mississippi.
CITY OF JACKSON, Mississippi
v.
CITY OF RIDGELAND, Mississippi and City of Madison, Mississippi.
No. 58267.
Supreme Court of Mississippi.
May 31, 1989.
Rehearing Denied November 8, 1989.
*862 James L. Carroll, Douglas J. Gunn-Watkins & Eager, John Hedglin, Tim Hancock, Jackson, Joe R. Fancher, Jr., Canton, for appellant.
Steve H. Smith, G. Milton Case, Smith & Case, Ridgeland, Jerry L. Mills, Pyle, Dreher, Mills & Woods, Jackson, Jerry R. Wallace, Montgomery, Smity-Vaniz & McGraw, James H. Herring, Herring, Long & Joyner, Canton, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This is not an ordinary annexation case. Much more is at stake than whether a large municipality may annex 4.92 square miles along its northern border. Rather, we must decide whether Mississippi's largest and capital city, already largely land-locked by a plethora of bedroom communities, will have another nail driven in the coffin which, if closed, will doom it to the fate already experienced by so many central cities around the nation. It is patently unreasonable that this should occur.

II.
On November 13, 1984, the City Council of the City of Jackson, Mississippi, enacted an Ordinance for the annexation of 4.92 square miles along its current northern border. The area to be annexed lies in the southernmost part of Madison County immediately north of County Line Road, which separates Hinds and Madison Counties. The area embraces the intersection of Highways I-55 and I-220 and lands to the west thereof.
The area is largely undeveloped. Some thirteen commercial establishments occupy approximately 54.7 acres, while two small churches take up three acres and a lodge fills another acre. In the southeast corner of the annexation area lies Tougaloo College's 472 acres, only 86 of which are presently utilized as campus. The evidence before us reflects 65 residences in the area, exclusive of the college. Four hundred seventy-two acres have been developed and are in use, out of a total of 3,149. If approved, the annexation would increase Jackson's land area by 4.7 percent, its population by 795 or 0.6 percent.
There is a larger picture. Jackson's growth to the northeast is limited by the abutting City of Ridgeland, Mississippi. See City of Jackson v. City of Ridgeland, 388 So.2d 152 (Miss. 1980) (in which Jackson unsuccessfully opposed Ridgeland's efforts to expand its corporate limits). To the east and southeast are Flowood and Pearl and Richland which in recent years have vigorously resisted Jackson's expansion. See In re Incorporation of the City of Pearl, 279 So.2d 590 (Miss. 1973); City of Jackson v. Town of Flowood, 331 So.2d 909 (Miss. 1976). More significant to the east is the western boundary of Rankin County, a legal barrier erected by the Mississippi Legislature. Miss. Code Ann. § 61-9-5 (1972) (unanimous consent of Rankin County Board of Supervisors required before Jackson may annex territory in Rankin County). Southerly growth is as well proscribed in substantial part by Rankin County and the Pearl River. To the west is Clinton whose aggressive annexation policy in recent years has led to its sharing with Jackson a common boundary. See In re Extension of Boundaries of City of Clinton, 450 So.2d 85 (Miss. 1984).
While not quite so clogged that infarction is imminent, the arteries potentially carrying blood to Jackson's heart have for all practical purposes been reduced to two: the north and northwest, and to the southwest, west of Highway I-55. At stake today are some 4.3 miles of Jackson's northern boundary, the easternmost 4.3 miles not locked in by Ridgeland's southern *863 boundary. If denied the annexation at issue, and if the area becomes a part of another municipality, Jackson's northwest artery will be constricted to a narrow corridor along Highway 49.
We are told by reference to the traditional criteria for annexation that Jackson's case is weak. The point lacks punch as one and all know, as surely as the sun will rise in the morning, the lands at issue will soon become a part of some municipality. Within our actual and judicial knowledge a considerable effort has been and is being expended to incorporate the area into the City of Ridgeland, albeit those efforts have been unsuccessful to date. See In re Inclusion Into the City of Ridgeland, Mississippi, 494 So.2d 348 (Miss. 1986). So seen, the arguments that there is no need for municipal planning and services in the area or that the residents desire to continue pastoral lives as country folk appear quite disingenuous.
Notwithstanding, the Chancery Court of Madison County credited objections by the City of Ridgeland, the City of Madison, as well as several area residents and landowners,[1] and denied annexation. In an opinion released August 12, 1986, the Court "concluded that the annexation proposed is not reasonable and should be denied."
The City of Jackson now appeals.

III.
A preliminary word is in order regarding, first, the scope of judicial review of an annexation ordinance and, second, the scope of appellate review of a Chancery Court's finding of unreasonableness.
Annexation is a legislative affair. The judicial function is limited to the question whether the annexation is reasonable. City of Jackson v. Town of Flowood, 331 So.2d 909, 911 (Miss. 1976); Ritchie v. City of Brookhaven, 217 Miss. 860, 870-73, 878, 65 So.2d 436, 439-40, 833 (1953).
That question is presented first to the Chancery Court, Miss. Code Ann. § 21-1-33 (1972), and invokes the interests both of the municipality seeking annexation, the owners of property and other inhabitants of the area sought to be annexed, and, as well, others who may be affected. See City of Greenville v. Farmers, Inc., 513 So.2d 932, 941 (Miss. 1987); Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057 (Miss. 1985). The Chancery Court has the authority to confirm the entire annexation, or such part thereof, as may be found reasonable. Here the Court found the proposed annexation unreasonable in its entirety.[2]
Where a finding of (un)reasonableness is challenged on appeal, we conduct no plenary review. We may reverse where  and only where  the Chancery Court's finding of ultimate fact that the annexation was (un)reasonable is manifestly wrong or without the support of substantial, credible evidence. McElhaney v. City of Horn Lake, 501 So.2d 401, 403 (Miss. 1987); Extension of Boundaries of City of Moss Point v. Sherman, 492 So.2d 289, 290 (Miss. 1986); Enlargement of Boundaries of Yazoo City v. City of Yazoo City, 452 So.2d 837, 838 (Miss. 1984); Extension of Boundaries of City of Clinton, 450 So.2d 85, 89 (Miss. 1984). We may reverse as well where the Chancery Court has employed erroneous legal standards or *864 where we are left with a firm and definite conviction that a mistake has been made.
To add flesh to the point, our reports include cases where we have reversed, in whole or in part, a Chancery Court's finding on the reasonableness vel non of a proposed annexation. City of Greenville v. Farmers, Inc., 513 So.2d at 941-42; Extension of Boundaries of City of Biloxi, 361 So.2d 1372 (Miss. 1978). And, we have reversed where the Chancery Court made its reasonableness finding through use of an incorrect legal standard. Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057, 1060-61 (Miss. 1985); Spears v. City of Oxford, 227 Miss. 801, 87 So.2d 61 (1956).

IV.

A.
The outcome determinative question of ultimate fact before the Chancery Court is the reasonableness of the proposed annexation. Over the years our case law has developed a number of factors that ought be considered in this context. Before listing them, we emphasize that these factors are but indicia of reasonableness and not separate or distinct tests in and of themselves. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989).
In a series of cases beginning with Dodd v. City of Jackson, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960) down through most recently McElhaney v. City of Horn Lake, 501 So.2d 401, 403-04 (Miss. 1987) and City of Greenville v. Farmers, Inc., 513 So.2d 932, 941 (Miss. 1987), we have recognized at least eight indicia of reasonableness. These include (1) the municipality's need for expansion, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) the potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, and (8) the past performance and time element involved in the city's provision of services to its present residents.
Other judicially recognized indicia of reasonableness include (9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation, Western Line, 465 So.2d at 1059; (10) the impact of the annexation upon the voting strength of protected minority groups, Enlargement of Boundaries of Yazoo City, 452 So.2d at 842-43; (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of taxes, Texas Gas Transmission Corp. v. City of Greenville, 242 So.2d 686, 689 (Miss. 1971); Forbes v. Mayor & Board of Aldermen of City of Meridian, 86 Miss. 243, 38 So. 676 (1905); and (12) any other factors that may suggest reasonableness vel non. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989).
In the end, the Chancery Court is charged to determine whether under the totality of the circumstances the annexation (or any part thereof) is reasonable, having due deference to the interests of the municipality and, as well, the interests of the parties affected. City of Greenville v. Farmers, Inc., 513 So.2d at 941-42.

V.
When the substantive reasonableness standard, and its various indicia as outlined in Part IV, are applied to the facts of the case at bar, even when constricted by our scope of review, see Part III, the error below becomes apparent. The Chancery Court's fundamental error was its concentration upon the trees, ignoring the forest  and, as well, the future. That Court appears to have thought the so-called Dodd factors eight separate standards, not elements *865 of a single standard. Far more important, the Court treated the Dodd list as exclusive, taking no note of what denial of the annexation might do to the long range future of Mississippi's capitol city.
Notwithstanding, some of the trees, when fairly considered, bend far more favorably to the City of Jackson than thought below.

A. The Municipality's Need for Expansion

The Court below perceived little need for expansion. The Court analyzed statistics regarding Jackson's population, economic and industrial growth, or lack thereof, and concluded that Jackson has minimal need for new lands. At the same time, the Court found the annexation "motivated by an apprehension of losing adjoining lands to another municipality with resulting loss of income from taxation."
Every municipality that hopes to become a great city has a need for geographical expansion and, perhaps more important, for a potential for expansion. But a glance at the map and Jackson's need not to have another 4.3 mile stretch of its corporate limits locked in by another municipality, whether Ridgeland or whatever, becomes overwhelmingly apparent, compelling a finding of Jackson's need for (potential for) expansion.
Jackson's need for an expanded tax base is reasonable as well. As a matter of fact, recent years reflect a gradual recession of Jackson's (economic) life blood to the various surrounding communities. These communities have experienced meteoric growth, most of them with a planned development. They have drained off and continue to drain off the life of the city's flow of wealth in people, culture and dollars. Indeed, the very statistics recited by the Court below are the product of the flight of so many persons from Jackson's corporate limits, not so far as to deprive themselves of full access to the economic, social and cultural benefits Jackson has to offer but only so far as to sever their relationship with Jackson's assessor and tax collector. Barring a wholly unanticipated act of altruism by Ridgeland, Madison, Flowood, Pearl, Richland, Florence or Clinton  not to mention unincorporated western Rankin County, Jackson faces the certainty of a slow but sure erosion of its tax base by the unilateral actions of these selfish former citizens.
Jackson's apparent need for (potential for) expansion strongly suggests the annexation is reasonable.

B. Whether the Area Sought to be Annexed is Reasonably Within a
 
Path of Growth of the City
The City of Jackson is correct that this factor requires only a showing that the area to be annexed is in a path of growth, not necessarily the most urgent or even the city's primary path of growth. Our law grants municipalities the discretion, based upon their perception of the public convenience and necessity, to choose between various paths of growth in enacting annexation ordinances. Ritchie v. City of Brookhaven, 217 Miss. 860, 65 So.2d 436 (1953). Moreover, "truth is that all areas immediately surrounding Jackson are in its path," as we perceived almost a decade ago. City of Jackson v. City of Ridgeland, 388 So.2d 152, 156 (Miss. 1980). With so few paths remaining  and the by-no-means-insignificant threat of today's path being cut off if annexation be finally denied, one may only fairly conclude that the facts on the path of growth issue militate strongly in favor of a finding of reasonableness.

C. Whether There are Natural Barriers Between the City and the
 
Proposed Annexation Area
The question here is the effect of the county line between Hinds County and Madison County. The Court below quite apparently considered this factor as one negativing reasonableness. Concededly, county lines should not be crossed willy nilly. Yet, problems arising from the existence of the city of Hattiesburg in both Forrest and Lamar Counties are quite minimal. Rule 201, Miss.R.Ev. The city of Baldwyn has long existed with the Lee-Prentiss County line dividing its main district. *866 Union straddles the Neshoba-Newton County line.[3]
Moreover, the city of Jackson is already in another county  the Jackson Municipal Airport is situated in Rankin County, without inordinate difficulty resulting. The Inter-local Cooperation Act of 1974, Miss. Code Ann. §§ 17-13-1, et seq. (Supp. 1988) expressly authorizes the procedure Jackson employs with its territory in Rankin and that which it proposes to use in south Madison County. Considering the otherwise reasonableness of the annexation, the county line as a barrier may only fairly be regarded as insignificant.
If one looks at the map, that portion of the area proposed for annexation which lies south of Highway I-220 and west of Highway I-55  an area which includes Tougaloo College, seems rather clearly precluded from annexation by any other municipality than Jackson. Common sense, of course, suggests that I-220 should no more serve as a barrier to Jackson here, than it does several miles to the west, or than does I-55 or I-20.

D. The Potential Health Hazards From Sewage and Waste Disposal
 
in the Area to be Annexed
The City of Jackson is correct that this factor in the reasonableness determination contemplates consideration of potential health hazards from sewage and waste disposal in the annexation area. The Court below concentrated on whether there are existing health hazards.
The focus of Jackson's showing here was upon the use of septic tanks in the annexation area. We have in the past regarded this as an indicia of possible health risks. See Bridges v. City of Biloxi, 253 Miss. 812, 178 So.2d 683, 687 (1965); Extension of Boundaries of the City of Biloxi, 361 So.2d 1372, 1375 (Miss. 1978); In re Extension of Boundaries of Philadelphia, 232 Miss. 582, 100 So.2d 100, 102 (1958).
The record points out that today the area is serviced primarily by septic tanks with minimal inspection of those tanks. Further, there are substantial livestock operations in the area, all of which are in a close proximity not only to the residential built-up area of Jackson, but also to the residential areas of Madison and Ridgeland. Still, candor requires concession that this is a relatively insignificant factor in the context of today's overall reasonableness inquiry.

E. The Municipality's Financial Ability to Make the Improvements
 
and Furnish Municipal Service Promised
The Court below found, obviously correctly, that "Jackson's ability to raise funds to provide services cannot be challenged." This funding must be coupled with the fact that the city council adopted the annexation ordinance, finding that the public convenience and necessity required the proposed annexation. Beyond this, Jackson has pursued the present annexation for what is now going on five years. These facts are what  and all  that are needed to place this factor strongly in the column of supporting reasonableness of the annexation.
The Court below expressed considerable concern about Jackson's "will and determination to provide full corporate services to the area." This is the sort of speculative evidence which ought seldom if ever be considered in an annexation proceeding. Cf. City of Greenville v. Farmer's, Inc., 513 So.2d 932, 941 (Miss. 1987).

F. Need for Zoning and Overall Planning in the Area

The annexation area is now and has for some time been zoned under the Madison County Zoning and Subdivision Regulations. The City of Jackson has a more complex zoning ordinance. There does not appear to be an immediate need for municipal level zoning and planning in the area. Still, the fact that a substantial number of *867 residents in the area have heretofore sought incorporation into the City of Ridgeland would seem to belie the suggestion that the people of the area are content with things as they are. See In re Inclusion Into the City of Ridgeland, MS, 494 So.2d 348 (Miss. 1986).

G. The Need for Municipal Services in the Area Sought to be
 
Annexed
The dominating fact here is that approximately 90 percent of the area to be annexed is undeveloped at this time. Concededly there is no immediate need for municipal services in the area. Yet in the past we have complimented the City of Jackson for annexing an area before it is fully developed. See Dodd v. City of Jackson, 238 Miss. 372, 118 So.2d 319, 330 (1960).
To the contrary, Objectors strongly criticize the 1976 annexation in southwest Jackson because that area was already substantially developed. Now Jackson is criticized for moving early enough to avert (some of) the problems experienced in 1976.
We have on numerous occasions affirmed annexation decrees where the land to be annexed was substantially vacant, rural or undeveloped. City of Jackson v. City of Ridgeland, 388 So.2d 152, 154 (Miss. 1980); Nowlin v. City of Pearl, 365 So.2d 952, 957 (Miss. 1978); Extension of Boundaries of City of Biloxi, 361 So.2d 1372, 1375 (Miss. 1978); Lowe v. City of Jackson, 336 So.2d 490, 492 (Miss. 1976); Bridges v. City of Biloxi, 253 Miss. 812, 178 So.2d 683, 686-87 (1965).
Moreover, a part of the reason for the lack of immediate need for municipal services is that the City of Jackson already provides service to a portion of the annexation area. Jackson has provided water and sewer service to approximately fifteen different businesses in the I-220 Business Park (part of Lakeover) and the AT & T facility along County Line Road since 1980. Upon request, Jackson has provided fire inspection services to Tougaloo College.
All things considered, reasonableness is suggested.

H. The Past Performance and Time Element Involved in the City's
 
Provision of Services to its Present Residents
Here our focus is upon the 1976 annexation, an undertaking in every way far more massive than that presently contemplated. Concededly, the City did not deliver on its promise of five year performance. The fact that the 1976 annexation included a forty plus square mile area, the largest annexation in Mississippi history we are told, coupled with the unspecified problems resulting from the 1979 flood, and, in addition, that the annexed area was already (not so) well developed,[4] presenting special problems not present here, are sufficient to render consideration of the 1976 annexation in the present context of at best marginal relevance.
By way of comparison, the 1976 annexation increased Jackson's land area by 65 percent and its population by 31.8 percent. The annexation presently under consideration would increase the City's size by 4.7 percent and its population by .06 percent. The experience with the 1976 annexation tells us little if anything regarding the reasonableness of the annexation presently at issue. See In re Extension of Boundaries of City of Biloxi, 361 So.2d 1372, 1376-77 (Miss. 1978).
Moreover, all Objectors' sound and fury about the 1976 experience only shows that Jackson has learned its lesson. The lack of substantial development in today's annexation area, considered in light of the early need to plan streets, sewage, zoning and to develop all of the services as a total package, only suggests reasonableness. One of the strengths of the City of Jackson's argument for annexation is the fact that we have here a relatively virgin area insofar as development is concerned.

I. The Fairness/Equity Evaluation

Here the Court is required to balance the equities by comparing the City's need to expand and any benefits accruing *868 to residents from the annexation with any adverse impact, economic or otherwise, which will probably be experienced by those who live in and own property in the annexation area. The mere fact that residents and landowners will have to start paying city property taxes is not sufficient to show unreasonableness. See Texas Gas Transmission Corp. v. City of Greenville, 242 So.2d 686, 690 (Miss. 1970).
The record reflects that homeowners in the area will experience a significant decrease in fire insurance rating and premiums as well as a host of other municipal services. Among the negatives gleaned by the Court below were Jackson's apparent intent to assess property owners with the cost of placing sewer collection lines and water distribution lines in the area and the fact that the voters of Jackson have not approved a school bond issue since 1964. No specifics are to be found. The effect of today's annexation upon those heretofore outside the city is quite different from the adverse effect from the City of Greenville reaching far out into rural Washington County and grabbing the Mississippi Power & Light Company power generating facility (away from the Western Line Consolidated School District's tax base), City of Greenville v. Farmers, Inc., 513 So.2d at 939, 942, or the small town of Horn Lake's effort to grab the infinitely larger and more prosperous Southaven community, Extension of Boundaries of Horn Lake v. Renfro, 365 So.2d 623 (Miss. 1978).

J. Dilution of Minority Voting Strength

The viability of this factor as an indicia of reasonableness was recognized in Enlargement of Boundaries of Yazoo City v. City of Yazoo City, 452 So.2d 837, 842-43 (Miss. 1984). The point was not considered below. Suffice it to say that no black persons have charged below or here that the annexation will significantly and impermissibly dilute black voting strength.[5] Indeed, with predominantly black Tougaloo College in the annexation area, we cannot imagine that this factor poses a problem.

K. Other Factors Affecting Reasonableness

As has been made clear, the Court below significantly misread some of the Dodd factors. Standing alone, however, we would regard it problematical that these misreadings would be sufficient to reverse, given our limited scope of review.
What tips this case over the line into the "reverse" column is the overwhelming presence of other indicia of reasonableness, indicia not heretofore specifically recognized in our prior decisions  and wholly ignored below. We refer, of course, to the point mentioned at the outset, that Jackson is becoming substantially landlocked by surrounding incorporated communities and, on its east, by an entire county. So seen, the finding below that the annexation was unreasonable appears manifestly erroneous. Our review of the totality of the circumstances leaves us with the firm and definite conviction that a mistake has been made.
There is no need to belabor the point. The most prominent path of growth in the greater Jackson area  to the northeast, east of I-55  has been completely cut off by Ridgeland on the north and by Rankin County's legal version of the Maginot Line on the east. And there is Clinton on the west. No doubt the hour is late, but Jackson's path of growth to the north and northwest simply must not be further constricted. We may not ignore that which we know, that a large city landlocked by the barrier of bedroom communities is destined to experience disaster. The public interest demands that we judicially enforce no such result beyond that clearly mandated by law.
*869 To be sure, no court can make a city grow and prosper, but we must do that which we judicially may. We must leave open Jackson's door to the future.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, and ANDERSON, JJ., concur.
DAN M. LEE, P.J., and BLASS, J., dissent by separate written opinion.
PITTMAN, J., not participating.
BLASS, Justice, dissenting:
Because of the great respect I have for the other members of this Court, and the high esteem in which I hold them, and because I believe it is our duty to reach decisions which represent, if possible, the collective experience and wisdom of the whole Court, I have tried very hard to agree with the views expressed in the majority opinion, but have concluded, finally, that I cannot. It is apparent that the learned chancellor who heard this case had carefully studied the earlier decisions of this Court and applied them to the facts as he found them. He concluded that the proposed expansion of the City of Jackson was unreasonable. I agree with the trial court and would affirm.
The simple truth is that I can find no good and valid reason, certainly no compelling reason, in the prior decisions of this Court to reverse the chancellor. The only reason we are reversing is that the Court has decided that the City of Jackson, and, perhaps, cities generally, should be allowed to augment their tax revenues by reaching out for new territories upon which to levy. When two cities want to tax the same area we shall be hard pressed to explain why one has a greater right than the other. Presumably, if one of the cities is the capital it will be preferred.
There is much discussion about the path of the city's growth, but I have not seen a decision which adequately explains why cities have the right to grow by absorbing those who do not wish to be absorbed. These hapless souls are not consulted. They are merely selected to provide additional revenues to be expended by those who have been elected by others and for purposes which probably will benefit, primarily, those who took them in. When cities are concerned we abandon the hallowed concept of democracy that the just powers of the government are derived from the consent of the governed. Nations which extend their boundaries without the consent of the occupants of the new territory are condemned as aggressors. Cities are merely vibrant and growing, even if every citizen brought in is screaming in protest.
Many good citizens move to get out of the city. Many have lived outside all of their lives and have no desire to come into a city. They are governed by a county government. They may be satisfied with it or, perhaps, feel that one local government is bad enough, without having to put up with two. Some are ordinary folk, living on fixed incomes, who are unable to pay the additional taxes. They are not selfish persons who have moved just far enough to escape taxes, while remaining close enough to enjoy the cultural benefits afforded by the city. Many probably prefer the murmur of the pines, the hum of insects, the early evening call of the whippoorwills, to the sounds of the symphony or the opera, and choose the light of the moon, the beauty of the stars and the flight of the fireflies to theater and ballet. They prefer, perhaps, rabbits to switch blades, petunias to "pot," and mocking birds to sirens. If some did, indeed, flee to the country, why should they be pursued? If city life is so advantageous and socially desirable as to be forced upon the people by judicial decree, why is there so much litigation in opposition to city expansion? Why are the people not clamoring for these advantages?
Nothing is free from the dynamics of change, neither man, plant, animal, social order, governments, nor demographic patterns. Once the country was predominantly rural. There was a great shift to cities and urban life became the apparent norm. Now the trend is changing, moving toward population patterns of less density. Improved methods of communications tend to *870 make great concentrations of population unnecessary and less desirable. New concepts of community are emerging and these may well require different governmental patterns, the combining of county and city governments and the elimination of waste involved in the duplication of jurisdiction and often overlapping efforts. The dinosaurs are gone. Cities, as we have known them may be on the way out. It is not the duty of the courts to attempt to stem the tide of change.
The people are entitled to the kind of life they want, if they can have it without doing injury to others. No group should be able to simply impose its will upon another, in the absence of some compelling requirement for the common good of the overall community. I do not see that need here. The majority opinion, written by my learned and distinguished friend, assumes that it is patently wrong and manifest error to say that the City of Jackson cannot expand to the north at this time. The opinion is clearly not required by any earlier decision of this Court, but simply represents a value judgment, skillfully buttressed by excellent legal prose. I do not agree, and cannot say that the chancellor was in error as to the law, nor clearly mistaken about the facts, and therefore, respectfully dissent.
DAN M. LEE, P.J., joins this opinion.
HAWKINS, Presiding Justice, dissenting:

ON PETITION FOR REHEARING
I would grant the petition.
Just as Washington, D.C., belongs to every United States citizen, Jackson belongs to every Mississippian. I am proud of our capital city, and have loved it since a child.
It is up to the inhabitants of Jackson, themselves, and the Mississippi Legislature, however, to solve Jackson's long range problems. Annexing the land involved in this case into the corporate limits is no solution.
I can make no improvement upon the learned opinion by the chancellor in denying this annexation. In my view the majority opinion fails to adequately address many of the chancellor's well studied findings. We certainly cannot say he was obviously wrong, and should for this reason affirm.
Because of its reasoning and conclusions, the chancellor's opinion is made an appendix to this dissent.
DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.
PITTMAN, J., not participating.

APPENDIX A

OPINION
This case is before the court on a complaint (also referred to therein as a petition) wherein the City of Jackson, Mississippi, seeks to annex a 4.9 square mile area in part of south Madison County, Mississippi. The area sought is immediately north of County Line Road (which separates Hinds and Madison Counties) and embraces a portion of the intersection of Highways I-55 and I-220 and lands to the west thereof. The proposed annexation would increase Jackson's land area by 4.7%.
There is substantial opposition to the annexation as evidenced by the interested parties who participated at the hearing. Vigorous objections and protests came from the City of Ridgeland, the City of Madison, the Ridgeland Municipal Separate School District, the Board of Supervisors of Madison County, two water supply associations (Bear Creek Water Association, Inc., and Livingston Water Association) and a number of residents in the area sought. The annexation hearing lasted approximately 18 days. Witnesses included urban developers and planners, engineers, financial and insurance experts, an economic analyst, an aerial photographer, department heads and supervisors from the City of Jackson, school officials and many others. The case for both sides was ably presented by participating counsel and was *871 fully developed through the testimony and voluminous documentary evidence.
There are 13 commercial establishments in the area sought occupying 54.7 acres, two small churches occupying 3 acres (none built in the last 10 years), one lodge on an acre, and Tougaloo College consisting of 472 acres, but only utilizes 86 acres as a campus. There are 65 residences in the area (exclusive of Tougaloo Campus), but there has been no residential building in the last 10 years. Four hundred seventy two acres of the land are in use out of a total of 3,149 acres.
Jackson in developing its case purported to show that the annexation was "reasonable" when viewed in the light of the various factors deemed relevant to such determination by judicial decisions. A more non-judicial argument constantly pressed by Jackson through its witnesses was that the city's survival is dependent upon annexation (but not necessarily this particular one) and if it is stymied in its expansion ventures will ultimately become land-locked, stagnant core city relegated to a tax base supported mainly by low, moderate and middle income inhabitants.
The necessary question that this court must answer is whether the proposed annexation is reasonable as gauged by those criteria enunciated in case decisions of our Supreme Court. The bulk of these cases has come during the last 30 years and include: Dodd v. City of Jackson, 238 Miss. 372, 118 So.2d 319 (1960); Extension of Boundaries of Horn Lake v. Renfro, 365 So.2d 623 (Miss. 1978); City of Jackson v. [City of] Ridgeland, 388 So.2d 152 (Miss. 1980); Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057 (Miss. 1985). In City of Jackson v. [City of] Ridgeland, 388 So.2d 152, 15 [153] (Miss. 1980), the Court quoting from the Horn Lake decision itemized certain of the factors to be considered in determining "reasonableness":
(1) The municipality's need for expansion; (2) Whether the area sought to be annexed is reasonably within the path of growth of the city; (3) The potential health hazards from sewage and waste disposal in the annexed area; (4) The municipality's financial ability to make the improvements and furnish municipal service promised. Lowe v. City of Jackson, 336 So.2d 490 (Miss. 1976); Bridges v. City of Biloxi, 253 Miss. 812, 178 So.2d 683 (1965); Dodd v. City of Jackson, 238 Miss. 372, 118 So.[2d] 319 (1960). Other factors that have been considered by the Court are: (5) The need for zoning and overall planning in the area; (6) The need for municipal services in the area sought to be annexed. Smith v. City of Meridian, 237 Miss. 486, 115 So.2d 323 (1959); (7) Whether there are natural barriers between the city and the proposed annexation area; and (8) The past performance and time element involved in the city's provision of services to its present residents. City of Biloxi v. Cawley, 332 So.2d 749 (Miss. 1976). 365 So.2d at 624-25.
In the recent case of Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057 (Miss. 1985), the Court recognized an additional factor to be considered, to-wit: "the interest of, and consequences to, landowners in the annexation area" and whether the city's need to grow is outweighed by "inequitable consequences to those in the annexation area." A multitude of facts were presented by the participants in an effort to demonstrate whether Jackson substantially met the criteria by which the reasonableness of the annexation is determined. Any comprehensive reiteration of the evidence produced would be difficult, if not impossible. I will endeavor, however, to notice briefly some of the more salient facts leading to the conclusion herein reached.

1.

Jackson's Need for Expansion
Jackson in support of its proposed annexation relied heavily upon a study report it prepared called North Jackson Annexation Study (Exhibit 12 in evidence). The participating respondents likewise utilized information contained in the document to refute the assertion that the annexation *872 was reasonable. Suffice it to say, the Study when analyzed with other relevant evidence does not strongly establish a need for expansion. From the facts presented it appears that Jackson is simply not increasing in population and this is so even though there is ample land available in Jackson for residential, commercial and industrial development.
It's surprising to find that between the years 1970 and 1980, excluding gains via territorial annexation, Jackson's population grew by only 1.04 per cent or a total of 1,650 people. This represents an average annual growth over the 10-year period of 165 people. Furthermore, Exhibit 12, p. 7, table 1, shows that Jackson's population between the years 1980 and 1982 increased by only 1,300 people or 0.6 per cent. Based upon estimates of the U.S. Census Bureau, Jackson's population in April of 1984 was 208,231. This represents an increase from April of 1980 (a four-year period) of only 1,334 persons per year. Interestingly, between 1980 and 1982 Brandon, Ridgeland and Pearl each out grew Jackson.
Exhibit 12, p. 8, table 2, shows that between the years 1970 and 1980 the land area of Jackson, through annexation, increased by approximately 110 per cent although its population (including people acquired by annexation) increased by only 31.8 per cent. Based upon the Population and Economic Study developed by Jackson in February of 1985, it had the 4th lowest population density of the eleven cities surveyed in the study. The population density of Jackson, like most cities, is decreasing. Jackson's population density since 1940 has decreased from 4,187.93 persons per square mile to 1,925.73 persons per square mile. Out of 170 cities in the United States with a population of 100,000 people or more, Jackson ranks 144th in lowest population density. Jackson's population density has not only decreased over the years, but a recent study establishes that Jackson's residential densities have increased. Thus, while the population density has substantially decreased over the past 40 years, the residential density of Jackson has increased. In addition to Jackson's low population density and its trend toward higher residential density, Jackson in 1985 had 34.3 per cent of its entire land area classified as vacant and available for future development. The North Jackson Annexation Study, p. 14, table 6, reflects that between the years 1981 and 1985 there were approximately 969.2 acres developed in Jackson or an average of 215 acres per year. If the development trend continues to 1990, only a total of 2,150 acres would have been needed for the decade of the 1980's. Jackson's estimate that it will need 10,484 acres to accommodate future land use needs by 1990 appears unrealistic. Jackson presently has 22,891.6 acres of vacant land (34.3 percent of its total land) and this appears sufficient to accommodate its foreseeable future growth. It is true 7,752.7 acres of the 22,891.6 acres are in the flood plain. However, much of the flood plain is developable as evidenced by the fact that between the years 1981 and 1985 (a 4 1/2 year period) 44.7 per cent of the land developed in Jackson was in the flood plain.
Some mention needs to be made concerning land Jackson now has available for commercial and industrial growth. First, Jackson has a 400-acre industrial park south of downtown Jackson that present has only 5 industries located in it. Second, Jackson has substantial undeveloped acreage in northwest Jackson constituting a part of what is referred to as the Northwest Industrial Development Concept. Third, Jackson has recently acquired for industrial development 350 acres of undeveloped land located mainly outside the corporate limits of northwest Jackson. It lies southwest of the land sought by these proceedings and Jackson's acquisition strongly indicates this industrial area to be in its path of growth.
Noteworthy is the fact that Jackson offered no specific plans for the area sought. One witness for Jackson described the area as sparse and slow developing and said he knew of no long range plans Jackson had for it. One Jackson industrialist and developer visualized the area as some day containing large industrial sites together with *873 residential developments for people who wanted to live on 25 to 50 acre tracts, albeit he knew of no need for such home developments at this time. Another developer testifying for the City took issue as to the area being suited for heavy industry and admitted growth in the area had been slow. The Mayor of Jackson stated that except for a few developers no one (exclusive of some Jackson officials) had expressed any interest in the proposed annexation.
Lastly, I would call attention to the substantial amount (approximately 50%) of designated "Park" land in Jackson that remains undeveloped, probably not required for parks, and which could, if needed, be put to a different land use.
It appears that Jackson's desire to expand is not predicated upon any internal growth in population, any increase in "people" density or of a lack of adequate developable land. Rather it is motivated by an apprehension of losing adjoining lands to another municipality with a resulting loss of income from taxation  and I suspect with little regard for the inhabitants of the area sought.

2.

Path of Growth
Jackson planners have traditionally divided the city into five geographic areas for statistical growth purposes designating them: "northeast, "northwest," west," southwest" and "center city." See, North Jackson Annexation Study, p. 9, table 3. The table reflects that between January 1, 1970, and December 31, 1984, the greatest single family housing growth in Jackson occurred in the northwest area (34.4%) and the second largest occurred in the southwest area (27.4%). The land sought to be annexed abuts the northwest area in which the housing demand has ranked only third (23%)  behind the northeast and southwest sectors. Furthermore, as of October, 1983, the northwest area ranked fourth among the five areas in apartment units built (northeast  5,825; southwest  3,125; west  3,106; northwest  2,558). In analyzing Jackson's growth figures, it is observed that Jackson redefined its so-called "northwest area" so as to include a geographical portion of what had been previously treated as "northeast" Jackson. This recent change in the designation of the northwest area resulted in bolstering the projected growth figures for northwest Jackson at the expense of what had been previously considered as northeast Jackson. The North Jackson Annexation Study, p. 62, Appendix A, purports to show that 133 commercial and industrial building permits have been issued in "northwest" Jackson since 1970. These figures also include permits issued in part (east of Highway 51) of what was historically considered as "northeast" Jackson. Of all these permits one-half were either issued more than 10 years ago or were for locations in what was formerly considered northeast Jackson.
It appears from the North Jackson Annexation Study, p. 66, Appendix B, that 44 subdivision plats were filed in northwest Jackson between January 1, 1970, and September 10, 1985. These figures, however, must be tempered by the realization that 15 of such plats were filed prior to mid-1975 and some of the lots shown thereon remain to be developed. Also, eight of the plat filings represent condominium conversions and not actual new plat recordings. Subdivision plat filings and commercial and industrial building permits issued for the areas of Jackson other than the northeast area were not shown  with the result that no comparison of growth in the various areas as reflected by plat and permit statistics is available.
In conclusion it does not appear that corporate Jackson has in fact experienced substantial growth and as to the growth which is occurring, the northwest area abutting the land sought to be annexed is not out pacing northeast and southwest Jackson in growth. The area sought to be annexed does not appear to be in the path of growth of Jackson anymore than other adjacent areas available for growth. The massive 1976 annexation recognized undisputably that at least at that time one of Jackson's strong paths of growth was to the south and southwest.

*874 3.

Potential Health Hazards From Sewage and Waste Disposal
Jackson failed to establish that the methods of sewage disposal now available in the area proposed for annexation constitute a health hazard to Jackson. No specific sewer problems were shown. Mr. Ted Somers, a city engineer and Deputy Director of Jackson's Public Works Department, testified that he had no knowledge of any health hazards in the area that had been reported to him. The absence of health hazards was confirmed by other Jackson witnesses. There was no evidence that Jackson at the present time would provide any different method of sewage disposal if the area were in the city.

4.

Financial Ability of Jackson to Make the Improvements and 
Furnish the Services Promised
The expenditures proposed to be made to furnish municipal services to the area do not appear significant when compared to the total of Jackson's annual budget, although capital improvements, exclusive of purchasing certificated service areas, will cost $50,000 per household in the area. Nevertheless, Jackson is facing financial problems and has seen it necessary in recent months to lay off some of its employees. Although Jackson's ability to raise funds to provide services cannot be challenged, there remains a substantial question as to Jackson's will and determination to provide full corporate services to the area. Obviously Federal austerity has not yet impacted on municipalities and it remains to be seen what demands will ultimately be placed upon the City's treasury. Certainly one surmises from the testimony of at least some of the council members of the City that they would be slow in extending full services to the area if it resulted in diminished services to the present city.

5.

Need for Zoning and Overall Planning in the Area
The proposed area is now and has been for sometime zoned under the Madison County Zoning and Subdivision Regulations. The evidence, although establishing Jackson has a more complex zoning ordinance that Madison County, failed to show that the area was suffering or being adversely impacted by inadequate zoning. There was no showing that past development in the area would have been different had it been subject to Jackson's zoning ordinance. Furthermore, it does not appear that foreseeable development requires the municipal level zoning and planning of Jackson.

6.

Need for Municipal Level Services in the Area
Exhibit 72 in evidence depicts the area sought to be annexed divided into three separate areas designated 1, 2, and 3. Area 1 is the area in which the Tougaloo College campus and the 220 Business Park are located. There has been neither commercial nor industrial development outside Area 1. The only land uses outside Area 1 are agricultural and residential. The combined brief of the City of Ridgeland and other protestors sets forth facts revealed by the testimony which shows that there is presently no real need in the area for municipal level services. The following statements from the brief are relevant on the issue and are adopted by the court:
1. At least ninety per cent (90%) of the entire area is undeveloped. Of the development that does exist, all the commercial and industrial development is in Area 1. Exhibit 12, pp. 2-3.
2. That of the estimated 795 people living in the entire proposed annexed area, 547 students and 18 faculty members reside on the Tougaloo College campus in Area 1. Exhibit 12, p. 3.
3. Area 1 is the only area into which the City of Jackson has extended utilities.

*875 4. That no person affected by the annexation outside Area 1 testified in favor of it.
5. That the City of Jackson's Planning Director, James Boyer, testified that municipal level services are not needed in Areas 2 or 3.
6. That testimony did not reveal a single new residence in Areas 2 or 3 within the last ten (10) years.
7. That there was no testimony of any pending or potential commercial or industrial development in Areas 2 or 3.
8. That all landowners residing in Areas 2 and 3 who testified opposed the annexation.
9. That landowners Costas and Riddell testified they had no plans to develop their property as shown on Jackson's future land use plan.
10. That there is no public access to Areas 2 without leaving Jackson as it would exist with annexation, going into the City of Ridgeland for some distance, and finally returning to the City of Jackson. The situation is almost identical to that in Extension of Boundaries v. City of Biloxi, 361 So.2d 1372 (Miss. 1978), wherein the Mississippi Supreme Court modified the Chancellor's decree to eliminate such an area.
11. Existing certificates of public convenience and necessity exist in Area 2 and Area 3 which would have to be purchased by the City of Jackson. This additional cost is not a part of the annexation plan of the City of Jackson. See, Bear Creek Water Association v. Madison, 416 So.2d 399 (Miss. 1982).
12. That not a single instance of an existing health hazard was cited in Area 2 or Area 3.
13. That not a single incompatible land use was cited in Area 2 or Area 3.
14. That substantial farming operations are occurring within Area 2 and 3 which would be affected by the annexation.
15. Old Agency Road in Area 3 is isolated. It would be necessary to leave the City as proposed and re-enter to reach Old Agency.
16. That the size and low population density of Areas 2 and 3 would make the provision of municipal level services inordinately expensive in view of benefit to be derived.
Mr. Tom Underwood, who testified for Jackson, is developing the 220 Business Park in Area 1. According to Mr. Underwood he had all the services he needed for the park. He saw no health hazards and felt the Madison County sheriff was doing a good job. He found fire protection adequate. He had found Madison County, Madison County Chamber of Commerce and Madison County zoning officials cooperative.
Several other additional facts bear upon this particular criteria and should be here noted. Jackson has no plans to put additional streets in the area and for the next five years contemplates only routine street maintenance. Mr. Black, Director of Public Safety for Jackson, stated there was no crime problem in the area. The Director of Human and Cultural Services for Jackson saw no need by the people of the area for the services of his department. In fact, with minor exceptions, witnesses testifying for Jackson, both lay and expert, could state few needs of the area as to municipal services, including zoning and planning. Many witnesses were either complimentary of the services being furnished by Madison County or were unaware of what services were available to the area inhabitants. Much of the Tougaloo property, exclusive of the campus, is low, flood-prone swamp land and cannot be expected to develop in the near future. It will take substantial drainage and access improvement before this particular section becomes attractive for development. Although touched upon in the above quote from the Ridgeland, et al brief, I would strongly reiterate that Areas 2 and 3, which constitute about two-thirds of the total area sought to be annexed, have seen no urbanization. In fact, Area 3, which constitutes over one-half of the land sought by Jackson, contains only a small day care center, a Mississippi Power *876 and Light power substation and 12 to 15 single family residences.

7.

Natural Barriers Between Jackson and the Proposed Annexation 
Area
There are no rivers to cross or mountains to climb in traveling between Jackson and the proposed annexed area. Nevertheless, the "county line" between Hinds County and Madison County, not visible on the ground, does represent a type of "natural barrier." Although not insurmountable, the evidence does establish that the annexation would present geo-political problems as to the governmental subdivisions involved and would complicate the relationship between the area citizens and the various government entities. Clearly the laws of Mississippi were not drafted with a view of accommodating a municipality which lies in two counties, albeit there appears no prohibition against the same. The annexation, if permitted, would raise real questions concerning the assessment and collection of taxes on real property and vehicles, voter registration, criminal and juvenile justice matters and apportionment of funds between government entities. More elusive, but worthy of note, is the psychic impact the annexation would have upon the inhabitants of the area who now strongly identify with the City of Ridgeland. Excluding the president of Tougaloo College, no permanent resident in the area expressed a desire to be a citizen of "Jackson, Madison County, Mississippi."

8.

Past Performance of Jackson in Providing Services to Its Present 
Residents
Jackson has not provided the services promised the residents brought into the city by the 1976 annexation. Not only have all of the services not yet been provided, but also the evidence indicates that it will be approximately another two years before all that was promised is performed. Thus, it will have taken Jackson 12 years to provide what was promised in five years. Jackson explained its failure was due to the delay caused by the 1979 flood and by having to rework many of the existing water lines in the annexed area. Although it was not shown the extent to which the flood contributed to the delay, one must assume that it did play a part. However, Jackson bought the Hinds-Rankin Metropolitan System three years before the 1976 annexation and knew or should have known the amount of curative work needed to update this system. Additionally, it should be noted that many of the improvements promised by Jackson were not cosmetic, but represented the correction of substantial health problems.

9.

The Interest of and Consequences of the Landowners in the 
Annexed Area
In Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057 (Miss. 1985), the court speaking of the criteria upon which reasonableness is determined said:
While the Dodd and Renfro criteria are helpful, they were never intended to be conclusive as to reasonableness. Other factors, including the interest of, and consequences to, landowners in the annexation area are relevant. The economic and personal impact on these landowners is an important concern as the city's need to grow. Only by reviewing the annexation from the perspective of both the city and the landowner can the chancellor adequately determine the issue of reasonableness. (Emphasis added) 465 So.2d at 1059.
The burden of proving reasonableness is upon Jackson. Extension of Boundaries v. City of Biloxi, 361 So.2d 1372 (Miss. 1978). Furthermore, "the common thread that must run through any reasonableness criteria is fairness." Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057 (Miss. 1985). In deciding if the annexation proposed is fair, it would assist to know the economic impact on the area to be included. Little was offered by Jackson in this regard with witnesses *877 who addressed the subject simply saying they saw no adverse impact on the area. The court gleaned from the evidence few advantages, economic or otherwise, to be gained by the inhabitants and landowners in the area. It seems apparent that Jackson's present intent is to assess the property owners with the cost of placing sewer collector lines and water distribution lines in the area, although there was no testimony as to the cost of these systems to the landowners. Certainly the law does not require Jackson to present evidence on every possible criteria and "reasonableness" must be placed upon a balancing of all the factors. Nevertheless, some estimate of the costs to be placed upon the people for the services they are promised would have been helpful.
Also to be considered under this criteria is that the evidence strongly suggests that the children in the area are well served by the school system now in place. On the other hand it appears that a substantial number of the voters of Jackson have not been magnanimous in their desire to upgrade and modernize their school facilities. Jackson has not approved a school bond issue since 1964.

Conclusion
In one manner or another many of Jackson's witnesses opined that the growth outside of Jackson "belonged to Jackson" as if to imply that Jackson was being swindled out of something it rightly deserved. From a partisan viewpoint it is an understandable opinion. One must concede that growth has taken place in areas surrounding Jackson because of the proximity of those areas to Jackson. But to assert that the growth belongs to Jackson is not the whole truth. Jackson presently has within its boundaries an abundance of land to accommodate all classifications of urban development. Nevertheless, we have seen that Jackson for more than a decade has experienced little more than zero growth, excluding the lands and people it has chosen to annex. Jackson has had difficulty in persuading or enticing industry to locate within its corporate limits in spite of its ample industrial sites. It has also not experienced the residential growth from the more affluent. A reason people and industry choose not to build in Jackson is, as Mayor Danks conceded, because of the taxes imposed by the City. Obviously, too, there are people who had rather live in a rural setting or who at least prefer not to live in a city or town.
Jackson argues that it needs more people within its boundaries if it is to maintain its present percentage of the total metropolitan area population. The argument is advanced as if a percentage decrease would surely signify failure or destruction. One suspects also that the argument is put forth with little consideration being given those selected to swell the percentage.
I fear Jackson wants the area not for any altruistic reasons but out of a phobia that it may be lost to another municipality  a fear probably shared by other neighboring municipalities.
Jackson has an abundance of land in its own county in which to expand  land which is in its path of growth. It may sound provincial but, in truth, the crossing of a county line creates problems not otherwise attendant to annexation of unincorporated areas in the same county. Furthermore, Jackson is not especially restricted as to where it can go. The land to its south, southwest and northwest are open to it. These are directions which prior annexation and acquisition (Northwest Industrial Park) have indicated to be in the city's path of growth.
After due consideration of the matter the court has concluded that the annexation proposed is not reasonable and should be denied.

ON PETITION FOR REHEARING
BLASS, Justice, dissenting:
I would grant the petition for rehearing for the following reasons.
As a reviewing Court, our duty is limited to a determination of whether the chancellor's finding on the question of the reasonableness, or unreasonableness, of the annexation is manifestly wrong. McElhaney v. City of Horn Lake, 501 So.2d 401, 403 *878 (Miss. 1987); Extension of Boundaries of City of Moss Point v. Sherman, 492 So.2d 289, 290 (Miss. 1986); Enlargement of the Boundaries of Yazoo City v. City of Yazoo City, 452 So.2d 837, 838 (Miss. 1984); Extension of Boundaries of Clinton, 450 So.2d 85, 89 (Miss. 1984).
This court has reversed a Chancery Court's finding on the reasonableness velnon of a proposed annexation. In the Matter of Extension of Boundaries of City of Jackson, MS: City of Jackson v. City of Ridgeland, MS, et al., majority opinion p. 863-864, citing City of Greenville v. Farmers, Inc., 513 So.2d 932, 941-42 (Miss. 1987) and Extension of Boundaries of City of Biloxi, 361 So.2d 1372 (Miss. 1978). This court has also reversed where the Chancery Court made its reasonableness finding through use of an incorrect legal standard. City of Jackson majority opinion at 863-864, citing Western Line Consolidated School District v. City of Greenville, 465 So.2d 1057, 1060-61 (Miss. 1985); Spears v. City of Oxford, 227 Miss. 801, 87 So.2d 61 (1956).
The Court has developed a number of indicia of reasonableness in Dodd v. City of Jackson, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960) and its progeny McElhaney, 501 So.2d at 403-404 and City of Greenville, 513 So.2d at 941. The majority opinion says here that the error of the chancellor in applying these indicia is apparent. With due respect to the majority, it is not apparent to me, nor is it apparent to the parties who have petitioned this Court for a rehearing of this case, the City of Ridgeland, and the individual landowners and residents of that portion of the annexation area marked as Areas 2 & 3 on Exhibit No. 72. The chancellor examined nine of our previously developed indicia in concluding that the annexation was not reasonable. These were: 1) Jackson's need for expansion; 2) Jackson's path of growth; 3) the potential health hazards from sewage and waste disposal; 4) financial ability of Jackson to make the improvements and furnish the services promised; 5) need for zoning and overall planning in the area; 6) need for municipal level services in the area; 7) natural barriers between Jackson and the proposed annexation area; 8) past performance of Jackson in providing services to its present residents; 9) and the interest of and consequences to the landowners in the annexed area. The Court's opinion does not say the chancellor was wrong in his analysis of the individual items, but that he somehow failed to grasp the significance of the totality of the circumstances.
The majority observes that the chancellor found that Jackson's case is weak in reference to the traditional criteria for annexation examined in prior cases. It recognizes that the original indicia of reasonableness, the so-called Dodd factors, has swelled to nine in the present case, and cites additional case law expanding the numbers to twelve. The Court then concludes that the Chancery Court's fundamental error was its concentration upon the trees, ignoring the forest. With all due respect, the majority, by the addition of a new factor, the character of the city of Jackson as the capitol of the state, has not helped to illuminate the forest, but has enveloped it in a fog of rhetoric.
An examination of our case law, most of it cited in the majority opinion, by which a chancellor is expected to determine whether or not an annexation is reasonable, and the proliferation of "indicia of reasonableness", and every new case seems to produce a new indicium, can only lead one to the conclusion, that "indicia of reasonableness" are either now devoid of substance or so malleable as to be meaningless.
The Chancery Court has the authority to confirm the entire annexation, or that part thereof which may be found reasonable. In earlier cases, this court has examined a chancellor's decision by analyzing the reasonableness of the annexation of certain portions of the total proposed annexation territory. See Enlargement of Yazoo City v. Yazoo City, 452 So.2d 837 (Miss. 1984). City of Greenville v. Farmers, Inc., 513 So.2d 932 (Miss. 1987); Extension of Boundaries v. City of Biloxi, 361 So.2d 1372 (Miss. 1978). I think that such an examination would be in order in this case, particularly where the objectors who filed *879 petition for rehearing occupy only two of the three deliniated territories.
The entire area which the City of Jackson seeks to annex encompasses 4.9 square miles. The area is divided into three separate areas designated by the chancellor in his opinion as Areas 1, 2, and 3. Area 1 is the part in which the Tougaloo College campus and the 220 Business Park are located. Its situation differs from Areas 2 and 3. This territory could realize some beneficial effects from annexation. Area 2, approximately one square mile, and Area 3, approximately 2.5 square miles are simply captured. The chief effect in these areas will be the leeching off of funds of the property owners through another layer of unwanted and unneeded government.
It is my opinion that, in examining the chancellor's decision, we should study his findings as to each indicator, as applied to each of the three areas, and determine whether his ultimate decision or any part thereof is manifestly in error. The annexation of Area 1 might well be found to be reasonable, but, if we are to respect our prior decisions, we would have to study the chancellor's opinion with greater care than we seem to have done. What distresses me about the Court's decision here is that it must necessarily weaken the confidence of the Bar and all informed laity in the Court's bona fides as it repeatedly proclaims the limitations upon its power to reverse the trial court. One is sadly but inescapably forced to the conclusion that manifest error may sometime be defined as simply making a decision with which a majority of this Court does not agree.
The last objection I have to the course we now follow is that we have turned a deaf ear to the cry of those who have no other hope of protection. Under our own decisions the first and fundamental test of reasonableness is fairness to the city and to those citizens who are being drawn into the city against their will. In the Matter of the Alteration of the Boundaries of the City of Horn Lake, Mississippi; J.W. McElhaney, et al. v. City of Horn Lake, Mississippi, 501 So.2d 401 (Miss. 1987); Western Line Consolidated School District; P.L. Bell, et al. and Farmers, Inc. v. City of Greenville, 465 So.2d 1057 (Miss. 1985). The truth is that this record reveals no real benefit to the residents of Areas 2 and 3. Their wishes are accorded no respect. They have zero input into the decision-making process. As stated above, they became subject to an additional government which they did not choose and do not want, and are required to pay additional taxes with money they may not have for services they do not want and will not get for a long time, if ever. To them, it is unfair and, therefore, unreasonable.
I would grant the petition for rehearing.
HAWKINS and DAN M. LEE, P.JJ., and SULLIVAN, J., join this opinion.
PITTMAN, J., not participating.
NOTES
[1] Before the Chancery Court of Madison County, the following parties appeared through counsel and objected to the annexation:

Walter Schmidt  individual landowner
Jack Daniel  individual landowner
Bear Creek Water Association  water company
City of Madison
Madison County Board of Supervisors
Ridgeland Municipal Separate School District
City of Ridgeland
In addition, there were approximately twenty (20) individual objectors not represented by counsel. All of the individual objectors shown above live and own property in the proposed annexation area.
The cities of Flora and Canton passed Resolutions opposing the annexation of part of Madison County by the City of Jackson but did not formally appear in the court below.
[2] At the very least, annexation of the Tougaloo College area sought of the I-55/1-220 loop should have been confirmed, as the college expressed a desire to become a part of Jackson.
[3] Annexation has not been the only, or even the most, prominent context in which we find violations of the integrity of county lines. See Miss. Code Ann. § 5-1-1 (Supp. 1988) (providing district lines for the Mississippi House of Representatives); Miss. Code Ann. § 23-15-1037 (Supp. 1988) (congressional districts); Martin v. Mabus, 700 F. Supp. 327, 337-49 (S.D.Miss. 1988) (ordering judicial redistricting without frequent disregard of county boundary lines).
[4] Much of the area had been "developed" by private interests, creating small subdivisions where streets did not connect. Before annexation there was no general sewage collection and no general municipal plan.
[5] Of course, the courts of this state have no authority to grant preclearance, which by virtue of Section 5 of the Voting Rights Act of 1965 may only be done by federal authorities. 42 U.S.C. § 1973c; Perkins v. Matthews, 400 U.S. 379, 388-95, 91 S.Ct. 431, 437-39, 27 L.Ed.2d 476, 484-89 (1971); Dotson v. City of Indianola, 514 F. Supp. 397, 399 (N.D.Miss. 1981), affirmed 455 U.S. 936, 102 S.Ct. 1424, 71 L.Ed.2d 646 (1982). Until preclearance is forthcoming, we must enforce the law as it existed before the objected-to change. Hathorn v. Lovorn, 457 U.S. 255, 268-69, 102 S.Ct. 2421, 2429-30, 72 L.Ed.2d 824, 836-37 (1982).