662 So.2d 597 (1995)
In the Matter of the ENLARGEMENT AND EXTENSION OF the MUNICIPAL BOUNDARIES OF the CITY OF MERIDIAN, Lauderdale County, Mississippi: Demetra Blackwell
v.
CITY OF MERIDIAN and City of Marion.
No. 91-CA-01211-SCT.
Supreme Court of Mississippi.
October 5, 1995.
*598 Willard E. Cook, Jackson, for Appellants.
Jerry R. Wallace, Wallace & Associates, Ridgeland, for Appellees.
Before DAN M. LEE, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ.
PITTMAN, Justice, for the Court:

PREAMBLE
This is an annexation petition that was originally filed on April 24, 1991, in the Chancery *599 Court of Lauderdale County. Chancellor George Warner recused himself and called on the Chief Justice of this Court to appoint a special chancellor. The case was ultimately heard and decided by Chancellor W.O. Dillard. Chancellor Dillard, on December 3, 1991, announced judgment in favor of the City of Meridian as to a part of the annexation territory. Objectors, Maxine Jacobs and Demetra Blackwell filed separate notices of appeal. The chancery clerk then filed her original estimate of appeal costs, estimating costs at $18,600.00.
Blackwell, on December 16, 1991, filed an application for limitation of costs and for designation of the record. On the same day, Jacobs filed a preliminary designation of record.
On December 23, 1991, the trial court entered its order denying Blackwell's application for limitation of costs and directed Blackwell to deposit costs of $24,600.00 before January 3, 1992. We note that the charges estimated by the chancery clerk at this point were presumptively reviewed and approved by the trial judge. The record in this case consists of the following: the clerk's transcript, volumes 1 through 16 (2,075 pages); the court reporter's notes or transcript, volumes 17 through 22 (1,218 pages); and exhibits, volumes 1 through 36 (5,333 pages). Further, in reviewing the record, it is noted that there are numerous blank exhibit pages which are numbered pages. The chancery clerk has informed this Court by cost bill dated August 30, 1993, that the chancery clerk's office billed $30,838.00 as the total cost of the record of this cause. Further, at that time the clerk's office notified this Court by the same document that the appellant, Blackwell, had paid $23,000.00 in cost and that the clerk had accepted the amount paid as full payment.
In response to a letter from the administrator of the Supreme Court, the Chancery Clerk's office of Lauderdale County by letter and attachment dated August 30, 1994, informed the Supreme Court that there were 12,988 pages of exhibits, court records and transcripts and that the cost at $2.00 per page was $25,976.00. Further, the chancery clerk's office showed a Supreme Court cost of $100.00 and a court reporter fee of $2,450.00 for a total cost due, at that time, of $28,526.00. Further, the chancery clerk's office informed this Court that $23,078.00 had been paid of the estimated cost and that there was an unpaid balance due of $5,438.00.
After a careful and meticulous review, this Court notes that the trial transcript prepared by the court reporter consisted of 1,225 pages at $2.00 per page for a cost of $2,450.00. We find that the clerks papers and the exhibits in this record total 7,408 pages. A charge of $2.00 per page does not appear to support the figures in the cost bill of 1993 or the cost figures submitted to this Court in August of 1994. This Court has questioned whether or not the appellants were in fact charged $4.00 per page for each page of the clerk's papers and the exhibits. In any event it appears that the cost bill presented to the Court and the cost required of the appellant, Blackwell, were exorbitant and beyond what reasonable cost should have been. These costs inaccuracies and inconsistencies have caused problems both in the trial court and this Court.
The undue delay in this cause has been primarily caused by an undue effort to thwart the objectors opportunity to be heard through excessive costs. The City of Meridian did from time to time insist that the entire docket, record, transcripts, hearings, notices, depositions, papers, letters, and correspondence relating to discovery, including depositions, interrogatories, requests for admissions, and all related notices, motions, or orders, and correspondence, be a part of the record. It is hard to fight city hall in annexation matters and in the instant case it has been made more difficult by the costly, unwieldy, and often unnecessary court record. In reviewing this unusually extensive record, we found that the City of Meridian code ordinances, which under the rules of this Court could have been forwarded as an exhibit, was, in fact, dissembled, copied, and inserted not in its printed or bound form, but as a copy of each page of the said ordinance the same consuming 689 pages or five volumes of the record. Photographs of the area to be annexed, which show that road signs had been shot by vandals and which were *600 used to show firearm violations, account for 105 pages. Photographs of the area to be annexed involving alleged subdivision deficiencies, the same having one photograph per page, total 463 pages. Photographs allegedly showing solid waste hazards, primarily, trash on the side of county roads, fill 882 pages of the exhibits. The appellant, through its designation of record and through its motion to limit designation and limit costs, attempted to rectify these excessive costs early on, but the trial court and this Court in reviewing the motion and the arguments made did not have or did not scrutinize the record at that time. Only after receiving the record and through a belaboring page by page review and analysis, did this Court realize that the costs required to be paid by the appellant had been manipulated in such a way as to discourage any appeal. Not only does the cost and the record discourage appeal, but in the instant case, the cost caused laborious review by this Court, delay, confusion, and disgust. Suffice it to say that the cost of appeal and the cost of a designated record should never be used as an offensive or defensive weapon in litigation. This Court has reviewed and modified the rules of the Court to attempt to avoid cost problems, such as arose in the instant case, for future cases.
Again, while it appears that the record and the record costs were so constructed and manipulated to discourage appeals and possibly to expedite the City's desire to annex, the result is and has been to add unusual delay and unusual review.
In the pages that follow, the Court rules on the merits of the City of Meridian petition for annexation which without the cost problems is a rather simple case and could have been decided by this Court months and possibly years sooner if not for the cost problems.

STATEMENT OF THE CASE
Due to the numerous motions and allegations filed, this Court, via an order entered on January 4, 1992, and in order to confine and clarify the issues to be considered by this appeal, appointed Francis Bowling as a special master. This Court further ordered for a Rule 33 of the Mississippi Rules of Procedure hearing to be held on January 10, 1992. A report authored by the special master was presented to this Court. The following summarizes the findings contained in that report.
On March 19, 1991, the City of Meridian adopted an ordinance. This ordinance sought to enlarge and extend the existing corporate boundaries by some fifty-three square miles. The petition for ratification, approval and confirmation of the proposed annexation area was filed by the City of Meridian in the Lauderdale County Chancery Court on April 24, 1991. While there were several objectors to the annexation as proposed, Demetra Blackwell [hereinafter Appellant], Maxine Jacobs and Hugh Johnson were the only three objectors who opposed the annexation of the smaller Phase I area.
The trial began on November 12, 1991, and continued through November 22, 1991, wherein Special Chancellor Dillard heard testimony relevant to his decision of whether to annex the proposed area.
The City, joined by the City of Marion and the Lauderdale County Board of Supervisors, along with several of the parties involved in this litigation, moved the court to bifurcate the hearing and solely consider the annexation of the southeastern portion of the annexation area, otherwise known as the "mall area" or "Phase I area." Appellant Demetra Blackwell, Maxine Jacobs and Hugh Johnson did not join in this motion. Initially, the chancellor denied this request, and the trial proceeded with numerous expert witnesses being introduced.
On November 20, 1991, the chancellor, after conferring at length with the attorneys, decided that he would proceed and consider only the mall area or Phase I area.
Pursuant to Rule 54 of the Mississippi Rules of Civil Procedure, judgment was entered on December 3, 1991, confirming the annexation, as to this twelve square mile area southeast of the City. The remaining area proposed for annexation by the City was not considered in this final judgment.
*601 Aggrieved by the special chancellor's findings and rulings, Appellant perfected this appeal on December 2, 1991.
Maxine Jacobs filed a motion requesting more specific findings of fact and conclusions of law, which the chancellor denied. Thereafter, Jacobs filed with this Court, a Petition for Interlocutory Appeal. By Order dated March 18, 1992, this Court denied the Petition. While Jacobs moved forward and filed a Notice of Appeal with this Court, she later executed with the Appellees, a settlement agreement and she withdrew from the present action. An Order by this Court evidences this action in dismissing her cause.
According to the report and findings made by the special master, there did not appear to be any objection to the chancellor's ruling to limit the trial to the mall area (encompassing approximately twelve miles) and from that point forward, the sole issue tried in this annexation proceeding concerned this twelve mile area. The report filed by Bowling specifically stated:
There is absolutely no contradiction that after eight days of trying the 53 proposed additional square miles the case was completely and wholly narrowed to the one issue of whether or not the City could annex the mall area that it was then in the process of negotiating with a developer... . I respectfully submit that there is only one issue in this case, and that is: WHETHER THE PROPOSED MALL AREA ANNEXATION WAS REASONABLE AND REQUIRED BY PUBLIC CONVENIENCE AND NECESSITY.
I have found no case where a city was permitted to negotiate with a developer to construct a shopping mall and then extend the city limits for the sole purpose of building the mall.
[T]here are circumstances shown by this record that need this Court's attention.
First, I am almost appalled at the amount of the appellate prepaid cost that was required in this case. For instance, almost 200 pages of the lengthy record in this case should not be there... . I recommend that the Court, through proper personnel, investigate not only the compiling of this record and resulting required appellate cost, but other appeals.

STATEMENT OF THE FACTS
This appeal concerns the annexation of approximately twelve square miles located in the southeastern corner of the City of Meridian [hereinafter the "City"]. Within this twelve square miles, that is, Phase I, are two distinct areas. Half the area is known as the Bonita Lakes property, which the City owns and uses as a recreation area, watershed, and municipal golf course. The remaining northern half is the region proposed for constructing the regional mall.
The City initially employed Michael L. Bridge to conduct an annexation feasibility study. Bridge determined that the area sought by the City was indeed a reasonable area for enlargement of the city limits.
The City then developed and submitted its financial proposal for planning and for providing municipal services to the residents within the proposed annexation area. These services included fire and police protection, water and sewer, and certain highway improvements.
On November 12, 1991, the trial to confirm the March 19, 1991, city ordinance started underway with the City first presenting their case in chief. The City first discussed the vast amount of territory that was proposed in the annexation ordinance, some 21,306 acres. However, the City stated, 6,648 acres or 31.2% of the proposed annexation area was currently vacant and available for development. The City then at length discussed each of the indicia recognized and adopted by this Court for annexation proceedings. Ed Skipper, city clerk for the City, and Michael Bridge, an expert in the field of urban planning and as an annexation consultant, testified to several aspects of the proposed annexation as well as the relevant indicia.
The objectors, namely the Lauderdale County Board of Supervisors and some 1700 individuals, opened by announcing to the court that the City's ordinance sought to triple the existing city limits and was, in all likelihood, the largest annexation attempt in the history of the State of Mississippi. The *602 Board and objectors then proceeded to refute the proof and allegations (as they related to the indicia and ability of the City to successfully annex the area) made earlier by the City.
Later in the initial proceedings, the area known as the mall area and the Bonita Lakes, that is, "Phase I," area was discussed. According to the record and statements made by Chancellor Dillard, there was no objection to the mall area proposed for annexation by the City:
In view of the fact that the opposition of some to the mall is being withdrawn, what would you think of let's considering that area first, and then the people interested in the mall area, we could either excuse them for a while, like Mr. Malone? I think it would be unfair to have your client's pay attorney's fees for you to sit through all this other if that's the area you are interested in... . Let's take the mall area up first, and then those interested in that area can then be excused, if they want to, while we hear the other areas.

* * * * * *
I am saying you can't annex part of it without considering all of it. But we can hear the testimony and evidence concerning that area first, and the parties not interested in anything but the mall, could you know, be excused without having to sit through the entire proceeding.

* * * * * *
I am not saying, and I do still think that the Court cannot approve part of the plan. The Court has to consider all of the plan to make a final adjudication on it. But as far as the evidence and the objections, if and I think the mall area is the focus of attention for a lot of the people involved.
In sum, it was concluded that because their respective properties were within the area known as the mall property/Bonita Lakes area, Demetra Blackwell and Maxine Jacobs were the only two parties objecting to this aspect of the annexation.
As part of his testimony, Mayor Kemp agreed that the City, Lauderdale County, and the Town of Marion all agreed to allow the areas (mall site and Bonita Lakes) to be annexed into the City limits. The questions then focused on the reasonableness of the annexation and specifically whether the City had adequate financial plans for providing water, sewer, fire, and police protection to the area. However, there were no actual estimates of cost development of the Phase I area. Kemp agreed that by taking in the Phase I area, the City would have additional develop able land but that it still was limited due to the fact that the Lakes area was for the most part already developed by the City as a recreational area. In the event the Lakes area were included, there was talk of spending $2-4 million dollars on the recreational aspects within the area. Some of the money (possibly 50%) could be generated by federal funds, some from bond issuances. However, the City had made no firm commitments with regard to this particular development.
Again, through cross-examination of Kemp, it was apparent that Lauderdale County was cooperative with regard to the area in question. Primarily the testimony that was in dispute concerned the City's financial situation in the event the entire 53 mile area proposed was annexed.
Mayor Jimmy Kemp, one of the City's central witnesses, was tendered and accepted as an expert in the field of civil engineering, land surveying and municipal administration. Kemp authenticated the City's municipal ordinance proposing the annexation and also the resolution which requested that the mall area be classified as the expedited annexation area. Kemp described the latter area as that between I-59 and I-20, Highway 80 and Highway 11 and also the city owned Bonita Lakes property. When asked whether the ordinance to enlarge was passed by the City council prior to conducting a public hearing for the benefit of the citizenry, Kemp responded that it had been, but only because they wanted to first determine what areas were to be included in the annexation so that the residents would be aware of which areas were proposed.[1]
*603 Kemp also discussed the document comprising the capital and financial improvement plans for implementation of the annexation ordinance, which passed by a unanimous vote of the City council and was signed and approved by Kemp on November 8, 1991. Kemp then extensively discussed the origins and development stages of the proposed annexation. Kemp stated that Mr. Herring and his proposal entered the picture after the City initiated the annexation. Kemp testified that he fully supported the annexation and based his opinion on economic development, fairness, and feasibility. In part, Kemp voiced concern over the continued decay of the existing City because of residential flight to outside the existing boundaries. Kemp reasoned that while the residents outside the City sustained certain of the City's services and infrastructure by using City tax dollars to provide them these services, those residents were not contributing towards local businesses and industry, which assist in generating tax revenues. Kemp's testimony focused on each of the indicia of reasonableness.
With regard to the City's infrastructure, Kemp discussed the existing Highway 45 by-pass and the proposed interchanges which all would be outside the City limits in the event the annexation was not approved. Kemp opined that this would have an enormous negative impact on the City as all the traffic on the by-pass would be outside any City boundary line. In addition, the proposed Highway 19 and Highway 45 by-pass was discussed by Kemp and he stated that its construction would not only have a tremendous impact on the traffic flow within the City, it would also have a positive economic impact on the City. Kemp believed that once the County paid in the requisite share of equalization taxes, (in 1990 the County only paid the City $231,000.00 while the City expended 1.6 million dollars to the County) this money could be used as the matched funds required for the State to construct the by-pass.[2] Kemp also discussed the major transportation arteries surrounding the City. Kemp stated that there were roads accessing all territory proposed in the annexation.
Mayor Kemp discussed the City's street and highway maintenance, stating that the City maintained all roads through the public works department. Part of the funding for this service derived from county refund money, collected by Lauderdale County and given back to the City. A resolution to equalize the tax benefits received by Lauderdale County had been adopted by the City and approved by Mayor Kemp on November 8, 1990.
The next area covered in Mayor Kemp's testimony was the provision of water and sewer services. According to Kemp, the City was planning to execute agreements with the rural water association as part of the plan to provide these services to the newly acquired territory. The resolution with regard to these services in relevant part read: "enlarge and extend municipal level sewer and water service as necessary, legally possible and financially feasible." Kemp stated that he was not acquainted with all the details as he relied on B.C.M., the engineering firm and organization who presented the plan, as feasible to the council. Kemp also relied on the feasibility study prepared by Mike Bridge and Joe Lusteck, and stated that a Meridian and Lauderdale County partnership had begun and would vastly assist the economic development of this particular area. The Bonita Lakes area was also discussed as a means to meet the demands for provision of water and sewer services and also additional recreational services. It was then admitted that the County and the Town of Marion had no objection to the City annexing this particular area. The court then inquired as to whether any individual objectors opposed the inclusion of this area within the City. The only individual objecting was Mr. Johnson.
According to Kemp, there was no budget, or proposed financial plan, or dollar amount *604 to implement water services to the actual mall area. Kemp did state that he would rely on B.C.M. and the rural water system to determine economic feasibility. Several water supply districts surround and service the proposed annexation area; therefore, there had to be some agreement with them or possibly a purchase of them (the total indebtedness of all water supply districts was estimated at 7.5 million dollars) in order for these districts to serve the newly acquired territory. However, the City had yet to approach these water districts with any form of proposal. Nevertheless, Kemp emphasized that the area currently had a water supply such that the City in all likelihood could work something out with the water supply district if it became necessary, "if it's economically feasible for a water association to furnish the areas out there, it's got to be economically feasible for the city to do it ... those things can be worked out as they go on." Further, Kemp stated that only the residents who received this service would be charged for it and that the City would only become financially responsible for it if indeed the City was later required to provide water.
According to Kemp's understanding of the water associations serving Marion and its residents, the City could not provide water unless it executed some agreement or purchased the associations; however, the City also could and would not charge Marion residents who continued to receive their water service from those associations. Kemp compared it to the existing agreement the City had with the City of Marion to treat its sewage.
In addition, the water supply system was discussed as it related to Marion's fire protection system. Marion had a volunteer fire department and the City estimated in the annexation cost, a tanker truck to use for fires in that area. According to Kemp, the rating in the newly acquired area would move from a Class 8 or 9 to a Class 5. The installation of fire plugs and hydrants was a possibility, depending on an arrangement with the rural water system. However, this did not appear necessary in the rural area as there were tanker trucks and boosters that could be used.
As to the water necessary for the City to provide adequate fire protection, Kemp stated that there were existing hydrants and also fire trucks available for fighting fires in the proposed area. Further, the cost of placing adequate fire protection was included in the estimated cost plan for the annexation.
Flood plains were discussed next and Kemp stated that FEMA designated certain land within the area as being a floodway. There was also discussion concerning the County being required to fund compliance with FEMA and also reference to the County being placed on probationary status by FEMA so that the County and City were planning to work an arrangement out concerning FEMA'S requirements.
One particular project discussed by Kemp was correcting the drainage and flooding problems from Sowashee Creek that ran from the Lakes area through the City. The Corps of Engineers was completing the 22 million dollar improvement which was funded by in lieu money from Pat Harrison to which the County contributed through a countywide tax levy. However, Kemp stated that 60% of this fund derived from the City taxpayers.
Kemp also discussed soil conservation projects that were currently underway; one near 8th Street and up into Highland Park, another within the Gallagher Creek area, and another near Robbins Creek area. These projects were funded through the soil conservation service, FEMA, and the City's budget.
Proposed fire station construction and relocation of existing fire stations were also discussed by Mayor Kemp, and he mentioned all the proposals for provision of fire protection to the newly acquired territory.
Kemp also stated that the tax millage for City residents had not fluctuated a great deal, with only a slight increase for maintaining the general fund for 1991 and 1992.
With regard to the amount of develop able land situated within the City, Kemp stated that due to the existence of flood plains and adverse topography, the availability of land within the current City was limited for development due to the locations of roads and highways. Kemp also stressed that the major *605 industrial parks were all situated outside the city limits, yet the City largely funded them. Therefore, certain of the parks were targeted for inclusion within the annexation.
After hearing extensive testimony from Mayor Kemp, Klimetz, and certain other experts, the chancellor bifurcated the trial to consider only the areas marked "A and B" on the annexation plan map, that is, Phase I or the mall area and the Bonita Lake property. In part the chancellor ruled as follows:
So that in this case, while everyone cannot agree, and the court will let everyone make their objections and motions for the record, the Court is going back to the scheme mentioned previously of dividing the area into quadrants, northeast, southeast, northwest and southwest, and can look at the overall plan and then make a determination as to the particular areas, and then those people who are only interested in one area will not be required to participate in all of the hearings when they are not interested in one quadrant or the other, although they will be given an opportunity to state their objection. So, at this time, or at this stage we'll call it phase one or the southwest quadrant, more or less, or at least the mall and Bonita property. The court is going to bifurcate the hearing to some degree to hear the evidence, that is, pertinent to the area that has been marked as I believe, area A and B. And then anyone else in the southwest quadrant that wants to state and objection to that or any other party that wants to object to that particular area, we will consider that at this time and perhaps the court then can approach the matter in different phases and accommodate the best interest of everyone by trying to make a reasonable approach to the entire overall plan.
The City, Lauderdale Board of Supervisors, Town of Marion, and several individual objectors all agreed that this area (A and B) was economically important to all of them, and therefore, via a motion, agreed to this announced proceeding. Maxine Jacobs objected to this ruling, requested that the court consider all the evidence relevant to the overall annexation plan.[3] In addition, counsel for Jacobs also relayed Demetra Blackwell's objection (neither Blackwell nor counsel for Blackwell was present for this). Counsel for Jacobs also moved for an interlocutory appeal based on this ruling that was later overruled by the lower court. In sum, the trial then proceeded to consider only the two areas.
Michael Bridge was called by the City as an expert in the field of urban and regional planning. Bridge initially discussed the compilation of land use data and overall how the annexation feasibility plan was drafted. Bridge's ultimate conclusion and opinion was that "the City of Meridian did have a definite need to expand its municipal boundaries." He also specifically discussed the need to incorporate the Bonita Lake area and the site for the mall's construction. According to Bridge, incorporation of both areas would provide a favorable economic stimulus for the City and the County. In reaching these conclusions Bridge considered the existing land use; the absorption of land via construction (commercial and residential); population trends; the relative paths of growth within the City; the fact that the area sought was contiguous to the City and interconnected with existing infrastructure; the existence of numerous health hazards and solid waste disposal and sewer problems in the area sought for annexation; the overall need for zoning and planning in the proposed annexation area; land use constraints due to flood ways, flood zones, and flood plains situated in the proposed annexation area; and the need for overall municipal services, including fire and police protection, recreational services, improved infrastructure, sewer and water and road management. Bridge also rendered opinions concerning the non-existence of natural barriers to the annexation, the acceptable level of past performance by the City in prior annexations; the absence of any affect of the annexation on minority voting strength, the absence of an adverse impact *606 on the residents within the area proposed for annexation, and the existence of several benefits including tax benefits for the residents within the proposed annexation area. The reduced costs for insurance, phone service, water and sewer improvements and services were all discussed by Mr. Bridge. Each of the above was specifically and extensively discussed, with the ultimate results being favorable to the City.
After hearing evidence by the City, the court then considered various motions and there was an extensive exchange regarding the failure of Maxine Jacobs to answer certain discovery requests for admissions submitted by the City and County. The chancellor determined that counsel for Jacobs (and the other individual objectors) had the right to proceed and voice all objections to the annexation proceeding. Further, he overruled petitioners' motion to exclude the evidence submitted by the experts retained by the objectors. Mr. Johnson, joined by counsel for Maxine Jacobs, moved the court to deny the petition for annexation and further to dismiss the entire proceeding as "the City failed to meet its burden of proof" and also because the effect of the annexation would serve to dilute the minority voting strength within the newly created municipal boundaries. The court overruled these motions. The motion pertaining to dilution of minority voting strength was overruled based on the fact that the evidence adduced at that point did not reflect such an impact. The court did state that were this motion to ripen, he would later reconsider it. Thereafter, the City rested, joined by the County, the objectors proceeded with their case in chief.
The following individual objectors all lived within the proposed annexation area (mall or Bonita Lakes areas) and all objected to being incorporated into the municipal boundaries. Mr. Ed Walker strenuously objected to the possibility of increased taxes and stated that he would be unable to afford and maintain his property (160 acres) should the annexation occur. David Terrell also voiced objection to his property (roughly 136 acres) being incorporated within the city limits. Terrell was also concerned about increased taxes and that the City would not provide the services promised. Terrell did state that he was not against the mall being constructed, rather he believed that the area slated for incorporation presently provided the needed municipal services.
Richard Moss next testified that he objected to his property being brought within the city limits of Meridian, stating that he was opposed to paying additional taxes for services he and his family did not need. It was however discovered that the City's fire station No. 5 was listed as a station from which he could receive fire protection services. Dale Radcliff also voiced objection to the annexation based on the fact that, as a senior citizen, he had a limited income and could not afford any increase in taxes.
Roderick Amos, offered and tendered by the objectors as a financial analyst, discussed and refuted the feasibility studies prepared by the City's expert Michael L. Bridge. In relevant part Amos discussed: 1) the disparity between the demographic study by Bridge and the U.S. census information; 2) the growth and population trends within the City of Meridian; and 3) the inaccuracies contained in Bridge's data pertaining to projected revenues. Amos relied on data prepared and contained in the actual census report and opined that the annexation as proposed would result in the City engaging in significant deficit spending. Amos further opined that the plan in place would not allow for the City to provide the promised municipal services; therefore the City overall did not have the financial ability to annex the additional territory.[4] Amos concluded that the City was not financially prepared for the annexation, that the annexation would adversely affect the residents, and that the report prepared by Bridge was not thorough and substantial enough for the magnitude of the annexation.
After extensive discussion over the objectors' additional motion to continue (that was *607 ultimately overruled), both sides rested. At that point in the proceedings, numerous individual objectors, all residents of the area proposed for annexation, came forward to voice their concerns.
In between certain of the objectors testimony, counsel for Jacobs moved for additional notice to be given to the individual objectors. The chancellor ruled that notice had been afforded such that all objectors had a right to be heard, if they chose to be in court. Once more, counsel for Jacobs moved to dismiss and against the petition for annexation and also for additional time to bring their experts to court. Both the City and County objected to any further or additional delays. The court took all motions under advisement, and returned the next morning to rule on them. Ultimately, the objectors were allowed to proceed with putting on two more experts: Mr. Al Clarke and Mr. Carroll Rhodes. Al Clarke, an expert in the field of appraisal of commercial and residential properties, testified next for the objectors. In relevant part, Clarke stated that should the annexation of the area in question be approved, Maxine Jacobs' property would increase in value, which would serve to increase her taxes on such property.
Carroll Rhodes, a licensed attorney and member of the Mississippi Bar and the Magnolia Bar Association, considered and discussed potential dilution of minority voting strength with regard to the annexation. Rhodes opined that sections 5 and 2 of the Voting Rights Act would come into play. First, section 5 would be implicated due to an overall decrease in the black population in the City of Meridian (from 45.3% to 40.3%). Second, section 2, concerning potential discrimination resulting from an unfair electoral scheme, might also be implicated. However, there had to be an independent determination made in order to see whether pre-clearance under section 5 would be required. Rhodes also stated that he was not sure what the City had in mind to build in the proposed area (commercial or residential), but that by annexing vacant areas, there "was potential for discrimination... but I agree that the ultimate decision rests with the D.C. District Court or the United States Attorney General."
The court then heard closing arguments, ruled and delivered a bench opinion, primarily to avoid any further judicial delay. The chancellor in allowing Phase I, parcels A and B (some 12 miles of the 53 miles proposed) to be annexed, determined:
The statute which controls is Section 21-1-33, and for the benefit of the public and the press, I'm going to read part of it, which I will incorporate into this opinion to show what the responsibility of this Court is to decide this issue, not on the fact of whether it is popular or unpopular ... The statute says, quote:
`If the chancellor finds from the evidence presented at such hearing that the proposed enlargement or contraction is reasonable and required by the public convenience and necessity, and in the event of an enlargement of a municipality, that reasonable public and municipal services will be rendered in the annexed territory within a reasonable time, the chancellor shall ... enter a decree approving, ratifying, and confirming the proposed enlargement or contraction and describing the boundaries of the municipality as altered. In doing so, the chancellor shall have the right and the power to modify the proposed enlargement or contraction by decreasing the territory to be included in or excluded from such municipality, as the case may be.'
[F]rom the evidence presented to the Court, and that's all I can decide this case on, the Court finds that the annexation plan for this area is reasonable and required by the public convenience and necessity, and reasonable public and municipal services will be rendered within a reasonable time, and therefore, as to parcels A and B, this Court must, under the law and under the evidence, so find.
So that, under that brief opinion, the Court finds that all of the factors enumerated in Dodd v. City of Jackson, ... that the Court has considered the totality of the circumstances and this particular parcel, and also that the annexation or any part thereof is reasonable ... So that insofar as *608 we have gone in this some nine days of testimony and exhibits thus far, the Court finds that the city has met the burden of proof to annex these parcels lettered A and B, and that the Court must confirm, ratify, and approve the city's petition to that extent.
Appellant, a resident within the proposed annexation area, disagrees. Judgment was entered on December 3, 1991. This appeal was perfected. On appeal, Appellant assigns the following errors for this Court's review:
I. THE LOWER COURT ERRED IN FINDING THAT THE CITY OF MERIDIAN HAD SUBSTANTIALLY MET ITS OBLIGATIONS IN PROVIDING SERVICES TO PREVIOUSLY ANNEXED AREAS.
II. THE LOWER COURT ERRED IN FINDING THAT THE CITY OF MERIDIAN HAS THE FINANCIAL ABILITY TO PERFORM THE IMPROVEMENTS AND FURNISH MUNICIPAL SERVICES TO THE PROPOSED ANNEXATION AREA.
III. THE LOWER COURT ERRED IN FINDING THAT THE PROPOSED ANNEXATION AREA IS IN THE PATH OF MERIDIAN'S PATH OF GROWTH.
IV. THE LOWER COURT ERRED IN FINDING THAT THE PROPOSED ANNEXATION AREA WAS REASONABLE TO BOTH THE CITY OF MERIDIAN AND THE RESIDENTS OF THE PROPOSED ANNEXATION AREA.
V. THE LOWER COURT ERRED IN FINDING THAT THE CITY OF MERIDIAN NEEDED TO EXPAND ITS BOUNDARIES TO ACCOMMODATE A SHOPPING MALL.
Based on the procedural history and the report of the special master pertaining to the present case, we find that there is only a single issue properly before this Court:
WHETHER THE PROPOSED MALL AREA ANNEXATION WAS REASONABLE AND REQUIRED BY PUBLIC CONVENIENCE AND NECESSITY?

RELEVANT LAW AND ANALYSES
WHETHER THE PROPOSED MALL AREA ANNEXATION WAS REASONABLE AND REQUIRED BY PUBLIC CONVENIENCE AND NECESSITY?

Applicable Standard of Review
"While annexation is a legislative affair, confirmation of annexations is within the purview of the Chancery courts." Robinson v. City of Columbus (In re Extension of the Boundaries of the City of Columbus), 644 So.2d 1168, 1171, reh'g denied, Dec. 1, 1994. To facilitate the review of annexation proceedings, this Court has adopted and utilized twelve indicia of reasonableness to analyze a chancellor's decision. These indicia are: (1) the municipality's need to expand; (2) whether the area sought to be annexed is reasonably within the path of growth of the city; (3) the potential health hazards from sewage and waste disposal in the annexed areas; (4) the municipality's financial ability to make improvements and furnish municipal services promised; (5) the need for zoning and overall planning in the area; (6) the need for municipal services in the are sought to be annexed; (7) whether there are natural barriers between the city and the proposed annexed area; (8) the past performance and time element involved in the city's provision of services to its present residents; (9) the impact (economic or otherwise) of the annexation upon those who live or own property in the area proposed for annexation; (10) the impact of the annexation upon the voting strength of protected minority groups; (11) whether the property owners and other inhabitants of the area sought to be annexed have in the past, and will in the future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes; and (12) any other factors that may suggest reasonableness. See City of Jackson v. City of Ridgeland (In re Extension of the Boundaries of Ridgeland), 651 So.2d 548, 551 (Miss. 1995); Municipal Boundaries v. City of Madison, 650 So.2d 490, 494 (Miss. 1995); Robinson, 644 So.2d at 1172; City of Southaven v. City of Horn *609 Lake (In re City of Horn Lake), 630 So.2d 10, 16-17 (Miss. 1993); In re Extension of Boundaries of Jackson, 551 So.2d 861, 864 (Miss. 1989); Bassett v. Taylorsville, 542 So.2d 918, 921 (Miss. 1989).
Recently, this Court called into question the complete reliance on these twelve indicia: "[a]lthough we retain our `indicia' for the purposes of today's decision, we emphasize that fairness to all parties has always been the proper focus of our reasonableness inquiry." Robinson, 644 So.2d at 1172.
This Court has determined that the substantial evidence/manifest error standard of review is to be applied in determining whether an annexation was reasonable. City of Jackson v. City of Ridgeland, 651 So.2d 548, 553 (Miss. 1995); Municipal Boundaries v. City of Madison, 650 So.2d 490, 495 (Miss. 1995); In re Extension of Boundaries of Jackson, 551 So.2d 861, 863 (Miss. 1989); Extension of Boundaries v. Sherman, 492 So.2d 289, 290 (Miss. 1986); Western Line Consol. School Dist. v. Greenville, 465 So.2d 1057, 1059 (Miss. 1985). This Court will affirm a chancellor's decision in an annexation proceeding if the chancellor's decision is supported by such substantial and credible evidence:
[I]f there is sufficient and credible, albeit conflicting evidence, this Court will defer to the Chancery Court's findings. In the context of conflicting credible evidence, this Court will not disturb a lower court ruling unless it can be said that from all the evidence such findings are manifestly wrong.
In re Boundaries of Vicksburg, 560 So.2d 713, 716 (Miss. 1990). [citations omitted].
Unless Special Chancellor Dillard applied an incorrect legal standard to the present case, this Court must abide by the above enumerated standard. As such, this Court's scope of review is dramatically limited and this Court only has authority to review the record to ensure that the chancellor's opinion is supported by substantial evidence and that in forming the boundary lines for the newly acquired and annexed area, the chancellor did not commit manifest error. See In re Extension of Boundaries of Jackson, 551 So.2d 861, 863 (Miss. 1989); In re Enlargement of Corporate Boundaries of Booneville, 551 So.2d 890, 892 (Miss. 1989); Bassett v. Taylorsville, 542 So.2d 918, 921 (Miss. 1989); Enlargement of Boundaries v. Yazoo City, 452 So.2d 837, 838 (Miss. 1984).

I. DID THE LOWER COURT ERR IN FINDING THAT THE CITY OF MERIDIAN HAD SUBSTANTIALLY MET ITS OBLIGATIONS IN PROVIDING SERVICES TO PREVIOUSLY ANNEXED AREAS?
Appellant contends that the Chancellor did not fully consider the City's failures in meeting its obligations promised to citizens and residents within the areas annexed in the last two annexations. Appellant argues that even though the City of Meridian has obligated itself to provide services to these previously annexed areas, through the adoption of Annexation Ordinances and Resolutions, the City's failure to perform on its promises to provide services to these areas indicates the City's lack of trustworthiness to fulfill future promises, including the one made in this present annexation bid. Further, Appellant offers several instances whereby citizens were not provided with city sewer service. First, the Chandler Road area, annexed in 1978, was not fully provided with city sewer service until fiscal year 1989-1990. In addition, city councilwoman Barbara Henson, a resident of the City, was not being provided with city sewer service at the time the annexation ordinance was adopted March, 19, 1991. Appellant argues that the City failed to offer excuses or reasons for these delays, and that the chancellor should have more fully considered this evidence.
The City counters this argument by stressing that the portion of the Chandler Road area that experienced a delay in receiving services was not developed at the time the area was annexed, thus the City did not fail in its duty, as there was not an identified need in that area at that time. The City reiterates its proposal to eliminate these health hazards by installing sanitary sewers in the annexation area in accord with the City's adopted plan.
*610 When questioned about providing promised services to the Chandler Road area, Mayor Kemp responded that this did create a problem and had been some twelve years in the works; however, the sewer service had been provided by the City, thereby rendering it a moot issue. Kemp reasoned that the City could not spend tax dollars on every area  priorities and choices had to be budgeted.
Bridge, as an expert for the City, acknowledged that the City had unpaved streets; yet, he stated that residential lot purchasers would pay for these paved roads via special assessment bonds. This prevented depletion of the general fund.
Bridge further discussed the implementation of additional police officers and equipment over the projected five year period. He stated that the plan was directly linked to the department's fiscal operating budget increasing each year and that the annexed area would receive enhanced protection by the accrued number of officers and vehicles.
The chancellor found that the City had met its burden of proof and that "reasonable public and municipal services would be rendered within a reasonable time." The testimony from Mayor Kemp, Mike Bridge and Robert Klimetz adequately support this finding by the chancellor. Therefore, this issue is without merit.

II. DID THE LOWER COURT ERR IN FINDING THAT THE CITY OF MERIDIAN HAS THE FINANCIAL ABILITY TO PERFORM THE IMPROVEMENTS AND FURNISH MUNICIPAL SERVICES TO THE PROPOSED ANNEXATION AREA?
The City's March 19, 1991, resolution states, in part, that the capital improvements are "to be completed within five (5) years from the effective date of this Ordinance, and when needed and when economically feasible."
Appellant contends that the City was without adequate knowledge of what it would cost to incur the additional services of providing water, sewer, and fire protection and further questions the City's financial situation with regard to the additional areas in need of services. Certain financial exhibits are quoted as proof of the City's inability to pay for the promised services.
Specifically, Appellant points to the fact that the City submitted a proposal containing a timetable for the hiring of additional personnel and equipment for servicing the proposed annexation area, however, this proposal failed to directly address the reduced annexation area, that is, the twelve mile area as opposed to the entire fifty-three mile area. "[T]he City has proposed numerous additions to their existing departments. At the same time, that the City laid this proposal out ... the City did, in fact, have a hiring freeze in effect for all city departments." However, Appellant also questions the fairness of an additional tax burden on the residents within the proposed annexation area in the event the promised services were provided by the City:
If the City attempts to follow through with each and every one of its promises to the annexation area, it would certainly result in an increased financial burden on the taxpayers of the City ... [b]ut for the City to fail to perform on its promises to the annexation area, would be a breach of its duty to perform the promised services in the area. Either way, the City of Meridian, its taxpayers, and residents would lose, and pay dearly for the loss.
The City contends that they presented an accurate analysis of the predicted revenues and expenditures to provide municipal services to the newly annexed area, including both with and without the development of the mall facility. The City relies on their comprehensive financial plans to provide the necessary services promised to the larger area and to the mall area and states that even without the construction of the mall it currently possesses the financial ability to implement the plans for servicing the newly acquired area.
The following evidence supports the City's financial ability to undertake this annexation.
John Turcotte, Executive Director of the Joint Legislative Committee on Performance, Evaluation and Expenditure Review, testified as to a report prepared by a Peer Committee. *611 Turcotte discussed the taxing and spending of the County and City as it relates to the indicia concerning the City's ability to pay for the services promised to the annexed area and to the "general other indicia of reasonableness."[5] Turcotte concluded that the report was based on raw data for the year 1990 and did not focus on the issue of needs of each of the three entities. Further, the report analyzed tax collections from the County (including the City), how those taxes were spent on road and bridge maintenance, and how much sales tax revenue was generated by the non-residents of the City.[6]
Robert Klimetz, as Chief Administrative Officer, was then called by the City as an expert in the field of municipal finance and administration. Klimetz testified to the City's annual financial report for fiscal year 1990, and to the financial plan and department reports proposed for implementing and fiscally carrying out the annexation. Several of the factors, reports and proposals for implementing the necessary services to the newly annexed area were discussed throughout Klimetz's extensive testimony.
Specifically, Klimetz first discussed the City's organizational structure. Based on the existing departments and personnel, Klimetz believed that the City was fully capable of acquiring and serving the additional territory and residents and that the City was in "excellent financial condition." Further, throughout Klimetz's twenty years of service, the City utilized a "modified accrual system" of accounting and therefore the City's budget ran "in the black." As a key part of his testimony, Klimetz discussed the financial proposals for implementing the annexation, with and without the proposed mall construction. It appeared that B.C.M. (an engineering firm employed by the City) calculated the costs of implementing sewer and water services to the area in the event the mall was not built. There were no exact figures; yet, Klimetz opined that the City was fiscally prepared for this endeavor.
Klimetz further narrowed and defined his testimony concerning the City's fiscal ability to provide the requisite services. Klimetz agreed that the current City encompassed thirty-five square miles with an additional fifty-five square miles proposed for annexing. The area proposed was "spotty" with regard to its development, meaning that there were certain areas developed and others underdeveloped. Klimetz thought annexing the entire area would serve to standardize the development and would be less expensive than annexing territory and then bringing it "up to code." Also, Klimetz discussed the plan for development over a 25 year period as opposed to immediate provision of all planned services.
With regard to zoning, Klimetz stated that the newly acquired area would in all likelihood, be developed in conformance with existing city codes.
Klimetz also discussed the revenue raising capabilities of the City, including timber, property and equipment sales. In addition, employee raises and health insurance costs were factored in as costs of the City running. Klimetz opined that the annexation would not cause the City to run "in the red" yet this could affect reductions in personnel and services.
The City's fiscal budget for 1992 gave $800,000 as the budget and would be reduced by some $500,000 in spending on water and sewer services that could affect the City's reserves. However, Klimetz also stated that B.C.M. was charged with the duty of assuring the City remained solid overall each year. In addition, Klimetz discussed the police department hiring freeze that was in place for approximately one month but added that this had passed and the department was now in fact back hiring.
*612 A report stated that the City planned to staff additional police officers to the new area, five the first year, five the next year, five the third year and three the fourth year. This was in addition to the existing Sheriff's department that already served the area. Mayor Kemp did state that this was not currently budgeted and would be possible only if the annexation was successful. There was also discussion of a hiring freeze for the end of fiscal year 1991, which would effectively not replace any released or departed police officers. The communication stated that this would be lifted as soon as economic conditions permitted. For the City's total thirty-five square miles, there were ninety-six sworn officers serving in law enforcement. If the total fifty-three square miles were annexed, eighteen more officers would be phased in to cover that area over the next four to five years. This amounts to a 150% increase in size with 15 more patrolmen and 3 detectives proposed to serve the increased area.[7]
According to Klimetz, the supposed goal to "capture 50,000 people" within the city limits was not a driving force or targeted goal behind the proposed annexation; yet, it would be a beneficial outcome of the annexation. Klimetz also discussed the increased size needing additional services, mentioned consolidation of some of the city administrative positions, and the increase in personnel for both the police department and the public works department.
According to Michael Bridge, one of the City's central witnesses, the revenues required to annex the additional territory would not derive from ad valorem taxes, rather they would be generated by bond issuances generated from the assessed valuation of the mall area. Notwithstanding certain figures and calculations, Bridge also calculated costs for services and improvements absent the construction of the mall.
As the financial aspect of the annexation, specifically the affect on the residents, was of paramount concern, Bridge concluded that the annexation of the two specific areas was reasonable because the City had met or was certainly able to meet all the indicia set forth in the test for reasonableness. Further, Bridge stated:
This annexation has the unique opportunity to benefit every taxing jurisdiction associated with that geographical area. The City of Meridian, if this area is annexed would benefit from the sales tax from the area sought to be annexed and the development of the mall. The residents of Lauderdale County would benefit by the property ad valorem taxes that would accrue to the property, to the county. The school district, Lauderdale County School District, would benefit by having the school taxes that support  the millage rate that supports the school district being applied to the value of the improvements associated with the mall and the area sought to be annexed. It is kind of what can be described as a win-win situation for everyone. This is one annexation, that is, difficult for political jurisdictions and taxing jurisdictions and the residents of the area to oppose. The residents would benefit within the annexation area by enhanced services and facilities and lower insurance rates. So certainly, this is an annexation that goes along way toward benefitting every affected party.
In conclusion, the record contains substantial evidence in support of the chancellor's ruling. The chancellor did not err in considering this issue and, as such, we affirm.

III. DID THE LOWER COURT ERR IN FINDING THE PROPOSED ANNEXATION AREA TO BE WITHIN MERIDIAN'S PATH OF GROWTH?
Appellant next contends that the chancellor erred in finding that the newly annexed mall area is within the City's path of growth. Appellant once again points to the fact that the trial first encompassed the entire proposed area of fifty-three square miles but was subsequently bifurcated to limit the evidence to the twelve square mile area, that is, the area which is the subject of this appeal.
Specifically, Appellant argues that the motivating factor in the City's determination to *613 annex this area is the hope, and that is all it is, that a mall will be developed in this area. Appellant also argues that the City's claim that it is losing population to the County is tenuous as such statistics are not reflected in the 1990 Census.
The City contends that the municipality's path of growth is determined by considering whether the targeted area is immediately adjacent to the city, accessible by in-use public streets, highways and roadways, is experiencing spillover of urban development from the city, has a community of interest with the city, and whether the city had made an investment in the area and established a presence on the area by the extension of its utility systems, recreational facilities, etc.
Appellee also contends that while there was testimony from Austin D. Check that the rate of residential growth lies in the northeast and northwest areas, there was no testimony in conflict with Bridge's that the City's path of commercial development is moving in the direction of the annexed area. Finally, Appellee relies on the fact that the City's population (within the proposed annexation area) grew more than 54% between the years 1980-1990, that is, at a rate of 5% per year.
With regard to the City of Marion and its objection to Meridian annexing the north area, Klimetz admitted that were the City of Meridian to incorporate that area, this would cut off Marion's path of growth.
The Town of Marion focused on the construction of the Highway 19 by-pass, and the area east of Highway 39 and north of the town. Therefore, it appears that the expedited annexation area was not disputed by the Town of Marion. The Town of Marion's primary concern with the annexation to the east of Highway 39 was that such action would block its path of growth in the event Marion chose to expand its boundaries in the future. Marion again was not opposed to the twelve square mile area currently before the Court. However, the area presented via this appeal is not in conflict with any future path of growth for the City of Marion and also appears to be directly linked to established activity that the City of Marion deems favorable and supportive of annexing.
Counsel for Maxine Jacobs specifically inquired as to the availability of land currently in the City for future development, to which Klimetz answered "there is available land, but not an ample amount of area, if we're looking to long-range plans for this City."
Based on the evidence adduced, this issue is without merit.

IV. DID THE LOWER COURT ERR IN FINDING THAT THE PROPOSED ANNEXATION AREA WAS REASONABLE TO BOTH THE CITY OF MERIDIAN AND THE RESIDENTS OF THE PROPOSED ANNEXATION AREA?
Appellant also contends that the annexation of the twelve mile area is only supported by the intentions of a developer to build a shopping mall in that particular area. Appellant questions whether the mall construction will ever take place and submits that in the event that it does not the residents of the City of Meridian, both old and new, will be left holding the bill for the annexation. Appellant is gravely concerned over a potential financial hardship the residents face, if the annexation is currently approved. Further, Appellant argues that the annexation of this area would require residents of the annexation area to finance improvements to the proposed mall site, which is now and had been for some time involved in a bankruptcy proceeding on file with the United States Bankruptcy Court.
The City counters these assertions by stressing the fact that there is nothing unusual or unique about the impact of this rather moderate annexation upon the taxpayers in the annexation area. The City states that the although the residents within the newly acquired territory will have to pay municipal taxes, they will in exchange receive compensating benefits, such as a reduced fire rating, fire protection, police protection, zoning and planning and building code enforcement services. Further, the City states that with regard to the mall project, the mall developer was to bear all expenses associated with the infrastructure to be provided by the City, thus funding is to come from the tax increment bonds on the mall property and *614 the taxes from the mall development would supply the money to pay these bonds off.
Mayor Kemp discussed the fairness issue, stating that in his opinion, in order to generate the needed sales tax to sustain the City, additional territory needed to be brought into the existing boundaries. This effectively would relieve the city residents from paying an unfair share of taxes that go towards the expansion of areas outside the existing city limits. Kemp applied the same reasoning for the County and permitting the mall to be developed so that those additional sales tax revenues could be used to the benefit of the County School system.
Kemp also discussed the additional taxes to be levied on the new City residents, specifically with regard to providing them with five additional police officers. There was also the possibility that "special assessments" might be levied against the residents. Kemp believed the City to be "fiscally sound" with or without the annexation; yet, he did question the future economic development without the annexation. Kemp agreed that the latest census revealed that the City and County population had decreased, but he explained this stating that when they discovered this fact, the annexation was proposed as a way to alleviate this problem as other larger cities had done in this state.
Kemp also discussed the City's population trends, stating that due to the increased age and poorness of the City's residents and the possibility that the County Supervisors could elect not to spend money back into the City, the City would become unable to sustain itself and would have to double tax existing residents. An example given was the more affluent younger people moving outside the City yet continuing to work within the City, thus utilizing the infrastructure that the City's residents pay for. Kemp firmly stated that the City of Meridian was the economic center of the area and that the County would be directly affected by any form of stagnation of the City, thus he opined that the City had a great need to expand its existing boundaries. Annexation of the area in question was reasonable based on this criterion.
Steven A. Thomas, chief of the City's police department, was tendered as an expert in the field of law enforcement. Thomas discussed the current personnel, services and programs within the department and also discussed the specifics of the City's plan to increase the personnel should the City acquire the additional territory.[8] The plans were to incorporate five additional officers and two to three patrol cars per fiscal year for the next three years, with three additional officers being employed the fourth year. The proposed cost was $181,518 for the first year; $180,000 for the second; $150,218 for the third; and $102,000 for the fourth year.
In sum, Thomas believed that the City had a need for the type law enforcement services proposed, especially in the area of traffic control near the Highway 45 by-pass and in narcotics-related activities within the proposed area. There was also discussion about the cooperation between the Lauderdale County Sheriff's Department and the City police department, specifically that each unit responded to the other's calls whenever necessary. In addition, both entities participated in the narcotics division. According to Thomas, the hiring freeze was over and the department currently had vacancies. Even with the extensive new territory, Thomas believed that the police protection would not be diluted within the City.[9] However, Thomas admitted that were the City's population to dramatically increase, the same number of officers were slated.
Thomas also discussed the fact that although the City would take four years to add the additional officers, the City would be adequately served by the existing force should all fifty-three miles be incorporated. Thomas considered factors such as county versus city crime rates and focused on the *615 increased narcotics problem outside the City. Thomas stated that the City and County had joint and ongoing undercover operations in an attempt to bring this under control. Thomas continually reaffirmed his position that were the City to incorporate all fifty-three square miles, law enforcement would be adequate for the City's needs. Considering all the testimony concerning existing law enforcement and planned or future police protection, the annexation was reasonable and fair to all parties.
Joe Shoemaker, an expert in the field of insurance and fire protection ratings, testified next for the City. In sum, Shoemaker discussed the existing fire protection and rating schedule for the City and also the proposed additions and ratings (as they relate to homeowner's insurance policies) in the event the annexation was successful. According to Shoemaker, Meridian was a Class 5 on a scale of 10 (with 1 being the most favorable rating) and all dwellings annexed would enjoy the same rating. Specifically, he stated that "after looking at the proposals, that the proposed stations and relocations and so forth, if properly manned and equipped would with the present growth in those areas, be adequate to sustain a Class 5." Comparisons were made as to the difference in insurance premiums with protection by Northeast Lauderdale Fire Department (a Class 8) and the City's Class 5 rating. These revealed that the City's fire protection and rating would create lower premiums for the citizens. There was also testimony that a large savings occurred in insurance premiums where a rating went from a Class 10 to an 8 or 9.
The water supply as it affected the rating system was next discussed, revealing that a higher level of water supply was needed for maintaining a Class 5 rating. He also stated that the City's plan to utilize tanker trucks as a water supply for the newly acquired area was an acceptable means to use during the City's transition period. However, he stated that a five year period was considered as a reasonable period of time for implementing additional water lines, structures and services. The reevaluation of the Class 5 could be affected at that point in time, considering the City's water supply, fire station itself, fire prevention services and communications. However, the means of acquiring the water was not factored into the analysis in rating, only the water supply was examined. Shoemaker stated that upon annexation the City would be given one overall fire protection classification.
Joe Taylor, fire chief for the City and an expert in the field of fire protection and fire department administration, testified that the City currently operated and maintained eight fire stations, staffed with 112 employees. Each of the departments were discussed specifically, including the number of trucks, tankers, radio and dispatch units, and personnel qualifications. Taylor discussed the equipment purchased and scheduled for purchase to serve the annexed areas. Further, he discussed the areas to be served by existing fire stations in the City and the construction and staffing of additional fire stations after the first year.
Taylor also discussed the water supply for fire protection services, specifically the water tanker trucks that would initially be utilized. Overall Taylor believed that the City currently provided excellent fire protection from which the newly annexed areas would benefit. According to Taylor, the City provided an extensive amount of both fire prevention services (code inspections, etc.) and emergency response to actual fires within the annexation area.
On cross-examination, many of the County fire stations (equipment, personnel and overall service) were compared to the City's fire protection services. Although Taylor was not aware of the County's tanker capabilities, he still believed that the City could better provide fire protection.
Once more, the testimony surrounding fire protection services (both existing and proposed) supports the issue of fairness for all parties. Therefore, annexing this area is reasonable and the residents will benefit from enhanced services.
Counsel for Maxine Jacobs in conducting cross examination of Mr. Bridge pointed to the fact that the objectors were concerned over the increased taxes which could result *616 from being annexed within the city limits. There was also an extensive discussion over the possibility for a decrease in property valuation once inside the city limits. Although Bridge did not research the value of property situated within the City as compared to outside the City, he concluded that "traditionally when an area is annexed into a municipality and is afforded the full range of services and facilities provided by the municipality, the value of that property would increase over time."
Kemp also discussed certain tax issues involved in and with the annexation. Kemp reasoned that while the residents outside the City sustained certain of the City's services and infrastructure by using City tax dollars to provide them these services, those residents were not contributing towards local businesses and industry, which assist in generating tax revenues.
Fairness must be factored into the analysis of determining whether an annexation is reasonable:
"[u]nless we can say that the chancellor was manifestly wrong, failed to use the proper standard, failed to adequately examine and apply the indicia of reasonableness or rendered a decision that was not fair and equitable to both cities as well as the resident citizens of the affected areas, we cannot reverse the case."
City of Jackson v. City of Ridgeland, 651 So.2d 548, 565 (Miss. 1995).
From the record it is evident that the citizens of the City, County, Marion, and affected areas will all gain from this area being incorporated into the existing city limits. The increased sales tax revenue alone will vastly contribute to the lagging economy. In addition, the increased services along with a new county school appear to be forthcoming so that any increase in tax dollars will be directed towards increased benefits and services.
Once more there is ample evidence in support of this indicia of reasonableness. Accordingly, this issue is affirmed.

V. DID THE LOWER COURT ERR IN FINDING THAT THE CITY OF MERIDIAN NEEDED TO EXPAND ITS BOUNDARIES TO ACCOMMODATE A SHOPPING MALL?
Finally, Appellant argues that out of a total of some 9,024 vacant acres within the City's existing limits, approximately 3,785 acres could be utilized for the construction of a shopping mall. Of this square acreage, 783 are already zoned for commercial use and 496 are currently zoned for industrial use, leaving 2,506 acres available for residential development. In support of the argument that the City lacks fiscal responsibility to its citizens, Appellant relies on the testimony of Mayor Kemp who testified that he had been approached by two other developers who were interested in constructing shopping malls within the existing City limits and one other developer who testified that the City currently possessed sufficient territory for mall development. Appellant specifically points out that other annexations, recently approved by this Court, were not factually similar:
The City of Meridian is not in the position of either Southaven, which had less than 900 acres available for development, or Horn Lake, which had over 830 acres available for commercial development. [citations omitted] Neither is the City of Meridian in the position of Columbus, where there was a total of 7,296 acres within the City and 1,535 acres were vacant due to certain acreage being located in either the floodway or flood plain, there were only 155 acres available for development.
It is clearly evident from the record and exhibits, that the City of Meridian does not have a need to expand its corporate limits and the finding of the Special Chancellor on this point was clearly erroneous.
The City submits that the level and extent of development within the City has significantly limited the availability of territory for such large commercial developments as the proposed mall. The City further states that research reveals that no city has ever been required to prove that there is no land available within its boundaries as a precondition *617 to expansion. The City also refutes Appellant's comparisons to other annexations by relying on the established precedent that if the chancellor's determinations as to an annexation is undergirded by substantial evidence, this Court will affirm such a decision.
Mr. Myron Garfield ("Buddy") Herring, tendered and accepted as an expert in the field of development of regional shopping malls, was called as a witness for the City.[10] Herring's testimony focused on the following points: 1) the feasibility of erecting a new shopping mall as compared to reworking the existing Village Fair shopping area; 2) assuring that there were sufficient revenues from the population and income to support a new facility; 3) the sites examined and proposed for the construction; and 4) road, highway and street accessibility to the newly constructed facility. Herring stated that if the proposed site (being the area 11/80 and Highway 45 by-pass) was approved and utilized, the State would be asked to construct and, according to a report by Bart & Ashmond, would in all likelihood construct (by obtaining qualified grants) a major highway interchange and road expansion in that area of the City. Herring's concerns were over the City being able to furnish certain public improvements including fire, sewer and water services to the newly constructed shopping mall. He stated that while there was a great deal of vacant land within the City, none of it was suited for development (of the 600,000 square feet for retail development) due to the location of flood plains, flood areas and overall road and highway accessibility problems. Herring stressed the importance of the mall being accessible to the entire trade area, rather than the City residents alone, therefore he believed that the area near the major interstates, as opposed to within the existing City limits, was the best area for development of this particular shopping facility. Herring emphasized that all development was on hold pending the outcome of the City's attempt to annex certain territory, and that without certain services provided by the City (as a result of the annexation) the proposal would and could not move forward. Herring's only interest with regard to the annexation was the mall area, and he had no interest or knowledge as to the rest of the proposed area. Herring was aware that the area sought to be included to which the County did not object, that is, the Bonita Lakes area, would increase the average household tax burden by approximately $18.00 a year yet at the same time would afford the County substantial monies for education purposes. Finally, Herring admitted that he purchased (from Mr. Jack Stack) an option (comprising about 200 acres) for some of the land proposed for the mall and that he could construct the shopping facility. However, Herring also stated that the project required certain services from the City, and that he had no opinion as to the ten to twelve square mile area known as the mall area which the City contended was necessary to and for the project or construction. Herring stated that the conservative estimated reports demonstrated that the revenues generated by the lease retail stores would be equal to or in excess of the overhead projections.
Mayor Kemp discussed the construction of the mall and stated that when he was approached by Herring, Herring revealed that his group had examined the entire area in search of the best site for the new shopping facility. Kemp reasoned that the annexation was critical for this construction because the group had to have certain services provided and the City as the larger municipality was best able to provide them. Kemp emphasized that the construction of the mall would greatly benefit the City's economy by creating jobs and supply demands during the construction phase, and would later serve the City in the form of additional sales tax revenues. In addition, Kemp stated that the expanded area proposed for the mall development was practical, as provision of the services needed could extend to the Lakes area, thus making the most out of the initial taxpayers expenditures. The proposed middle school to be constructed within the newly annexed territory was given as an example, as were requests by the Superintendent for *618 hook-up to the City's sewer line once established in the annexed area. Kemp believed that the area should not be solely limited to the mall construction as there was a great deal of potential for additional and future residential development. Although Kemp was aware of the vast amount of land proposed for annexation, he deferred to the experts who studied the overall feasibility and he believed that the plan encompassed both a common sense approach and a good economic development scheme.
Michael Bridge agreed that the annexation of the area was required to assist with the construction of the mall, and that it was logical to expand city services to that area for that purpose. The City of Meridian's plan was compared with the construction of the Northpark Mall located in Ridgeland, Mississippi, which resulted in wall-to-wall commercial facilities within that area. Bridge suspected that the City of Meridian would experience similar substantial commercial development and multi-family residential development within the mall area. In addition, Bridge reiterated that the tax funds and revenues generated in the new area would be used for the county school system and would be additional funds to add to the existing tax revenues.
Bridge conceded that if the construction of the mall resulted in increased valuation of property situated in the area, the taxes within that area would increase. Finally, Bridge also stated that he did not prepare studies as to the amount of taxes residents within the City were required to pay, nor did he assess these residents ability to pay their taxes.
The City, Lauderdale Board of Supervisors, Town of Marion and several individual objectors all agreed that this area, Phase I (A and B) was economically important to all of them, and therefore agreed to this area being incorporated into the City. Notwithstanding the parties' relative positions, there was substantial evidence that the enlarged recreational area coupled with the construction of the larger shopping mall would significantly boost Meridian's economy.
In conclusion, there is substantial evidence in support of the chancellor's ruling on this issue. The construction of a mall was not the sole consideration in this annexation being proposed, nonetheless, such construction will greatly boost Meridian's economy.

CONCLUSION
Based on the foregoing and the close scrutiny afforded to the proposed expedited plan of annexation by the chancellor at trial, we conclude that the limited annexation under the current standard of review and existing authority, was in all aspects considered and conditioned in a reasonable manner. While the chancellor heard extensive testimony and evidence concerning the entire fifty-three square mile proposed area there was a motion to reduce the courts consolidation to Phase I only, and the chancellor was within his discretion to limit and consider only a limited area of the proposed expansion plan. Thus the chancellor allowing only a portion or percentage of the proposed area to be annexed and finding this annexation reasonable, cannot be deemed manifest error. See Miss. Code Ann. § 21-3-33 (1972) (specifically authorizes partial approval); City of Jackson v. City of Ridgeland, 651 So.2d 548, 551 (Miss. 1995); Municipal Boundaries v. City of Madison, 650 So.2d 490, 494 (Miss. 1995); In re Enlargement of the Corporate Limits and Boundaries of the City of Gulfport, 627 So.2d 292 (Miss. 1993). Therefore, we conclude that the annexation and the described boundary lines for the enlargement of the City of Meridian was initiated, considered and decided in accord with the enumerated indicia of reasonableness.
Justice Smith, in In re Enlargement of the Corporate Limits and Boundaries of the City of Gulfport, 627 So.2d 292 (Miss. 1993), doubts the viability of the enumerated indicia of reasonableness. However, the cases decided by this Court thus far involving annexations rarely disallowed a city to expand its corporate limits. Hence, individual property owners opposing an annexation encounter an extraordinarily difficult burden. See Robinson v. City of Columbus, 644 So.2d 1168 (Miss. 1994). In order to overcome and disprove a reasonableness determination by a chancellor, the individual must convince this Court that the determination was so erroneous *619 that the chancellor could not reasonably have reached this result based on the adduced evidence.
The indicia set forth in Bassett v. Taylorsville, 542 So.2d 918 (Miss. 1989), are helpful, they do not appear capable of being viewed as concrete, clear and consistent legal standards. The totality of the circumstances must be examined and there must be a determination that the expansion brought about a fair result.
From the present record, there appears in the record substantial evidence, brought forward by the City, to support the determination by the chancellor. The annexation of the twelve square mile area by the City of Meridian viewed in its totality was reasonable and in conjunction with existing law. It is evident that Chancellor Dillard thoroughly examined and detailed with particularity the extensive trial testimony, reports, affidavits and voluminous exhibits. His determination to permit only certain and necessary portions of the proposed area to be annexed was neither manifestly in error nor unsupported by the evidence. In addition, his application of the indicia of reasonableness in conjunction with making the above determination is once more supported by sufficient evidence and was not manifestly wrong. See McElhaney v. Horn Lake, 501 So.2d 401, 403-04 (Miss. 1987).
Finally, expert witness Michael Bridge effectively summarized the nature of the present case when he stated:
This annexation has the unique opportunity to benefit every taxing jurisdiction associated with that geographical area. The City of Meridian, if this area is annexed would benefit from the sales tax from the area sought to be annexed and the development of the mall. The residents of Lauderdale County would benefit by the property ad valorem taxes that would accrue to the property, to the county. The school district, Lauderdale County School District, would benefit by having the school taxes that support  the millage rate that supports the school district being applied to the value of the improvements associated with the mall and the area sought to be annexed. It is kind of what can be described as a win-win situation for everyone. This is one annexation, that is, difficult for political jurisdictions and taxing jurisdictions and the residents of the area to oppose. The residents would benefit within the annexation area by enhanced services and facilities and lower insurance rates. So certainly, this is an annexation that goes along way toward benefitting every affected party.
Based on the abundance of evidence put on by the City and the fact that nearly all of the parties agreed that this area would clearly serve to economically benefit the City, we affirm the chancellor's ruling to extend the City of Meridian's boundaries to include the Phase I area, parcels A and B.
After a complete review of the record and as stated in the preamble to this opinion, this Court finds that Appellant should not be fully assessed with the costs for bringing this appeal. Therefore, Appellant is to be assessed with the following costs: 1) the costs for the court reporter's transcript; 2) the Supreme Court filing fee; and 3) those items contained in Appellant's designation of record. Further, all other costs of this appeal are to be assessed to the City of Meridian.
AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
LEE, P.J., concurs in result only.
McRAE, J., dissents with separate written opinion.
McRAE, Justice, dissenting:
Municipalities are creatures of the legislature. Matters of annexation and enlargement of boundaries, therefore, are properly within the ambit of the legislature and not of this Court. See Matter of Enlargement of Boundaries of Madison, 650 So.2d 490, 509 (Miss. 1995) (McRae, J., dissenting); Matter of Boundaries of City of Jackson, 551 So.2d 861, 863 (Miss. 1989). The saga of Demetra Blackwell's "battle against City Hall" makes *620 this point all too clear. Accordingly, I dissent.
I share the majority's outrage with the cities' attempt to manipulate the legal process so as to thwart Blackwell's opposition to the boundary enlargement. It correctly limited her liability to the cost of the court reporter's transcript, the Supreme Court filing fee, and those items contained in Appellant's designation of record. We are all too aware that annexation can be a high stakes game. When legal fees and costs are used as a battle tactic, fighting City Hall can only be done by the heavy hitters.
Under our present system where the courts decide the annexation boundaries, there is no room in this game for the small property owner, the farmer, or the retiree who seeks to live out his days on his own small piece of God's Country. Because this Court has held that a person has no right to have his property annexed, it follows that his interest in being annexed should hold no influential power. Matter of Boundaries of City of Jackson, 551 So.2d at 863.
It is incumbent upon the legislative branch to take annexations under its belt in order to give affected people a representative voice. This case is a classic one which shows that under our present system of annexation, one has no voice since the costs of fighting city hall from the trial court to this Court are outrageous. Accordingly, I dissent.
NOTES
[1] Kemp also stated that increasing the City's population to 50,000 was only a factor considered as it related to the City getting additional entitlement, etc.
[2] There was an extensive discussion about providing a right-of-way in the event the by-pass was not built. Kemp believed that zoning could possibly remedy the situation and did not think that this was a cost included in the estimation of cost of the annexation.
[3] Mr. Johnson (representing himself) also gave a lengthy rhetoric concerning his objection to the court's ruling.
[4] Counsel on cross examination referred to the fact that Amos relied on the financial data contained in the report prepared by the City and did not review any tax assessments or spending projections or millage rates in forming his opinions.
[5] The lower court allowed the exhibit to be entered into evidence stating that the report covered the issue of whether the City had sufficient revenues to finance the annexation.
[6] This revenue was estimated at approximately 1.4 million dollars so that the non-residents contributed 19.76 percent of the City's total sales tax revenue. However, the report did not estimate the dollar value of the city services (including streets, police and fire) which the non-residents received.
[7] Steve Thomas, chief of police later testified that all eighteen would be phased in as patrolmen.
[8] The City operated eight beats, with three patrol shifts within each beat. In the event of annexation, two additional beats would be created. The ratio of police per citizens averaged 2.3, with the national average being 1.9 or so.
[9] Specific calculations were made with the City's population and the number of patrolmen in the field. According to certain figures, the City presently had one officer per 432 citizens and after the annexation and during the first year would have one officer per 492 citizens.
[10] Herring had participated in the construction of some 20 different shopping malls throughout the country.